# Richmond

## SOUTH HAMPTON APARTMENTS, INC. v. ELIZABETH CITY COUNTY, ETC.

April 22, 1946.

Record No. 3044.

Present, All the Justices.

The opinion states the case.

*W. R. Ashburn,* for the plaintiff in error.

*James G. Martin & Son,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

In 1943, South Hampton Apartments, Inc., hereinafter referred to as the defendant, purchased a tract of land in Wythe District, Elizabeth City county, Virginia, near the city of Hampton, for the purpose of developing and constructing a large housing project to provide for an emergency during World War II. The corporation proposed to construct, and subsequently did construct, twenty-nine apartment buildings and one additional building containing a group of stores. Each apartment building contained twelve to sixteen apartments for twelve to sixteen families. The buildings can house approximately three hundred and seventy-five families.

There was no sewerage system adjacent to the location of the project, and it was necessary for the defendant to construct such a system at its own cost and expense. Prior to the commitment of financial aid to the project by the Federal Housing Administration, it was necessary for the defendant to make some arrangement for the permanent maintenance of the sewerage system. The defendant, through its president, Captain G. Alvin Massenburg, negotiated with the county of Elizabeth City, through its representatives, with reference to an agreement by the county to take over its permanent maintenance. The sewer system was of a size adequate to serve its buildings with a main and outfall line extending into Hampton Roads. Captain Massenburg submitted the construction plans of the project, including the plans for the sewerage system, to S. M. Gibson, a deputy clerk of the Circuit Court of Elizabeth City County, who acted somewhat as a county manager, and

was designated by the Board of Supervisors of the county to handle such matters.

There were numerous interviews between Massenburg and Gibson. Gibson advised Massenburg that he thought the county would be willing to make a contract with the defendant for the maintenance of the sewerage system; but that such a contract had to be approved by the Board of Supervisors. Captain Massenburg was informed that his corporation would be required to pay the same standard inspection and maintenance fees required of other similar housing projects.

Subsequently, R. E. Wilson, clerk, through S. M. Gibson, deputy clerk, by direction of the Board of Supervisors of Elizabeth City county, wrote the defendant a letter approving its plans, and agreeing to accept on behalf of the county the sewer system for permanent maintenance, providing the defendant should pay "the standard County inspection and maintenance fee for this type of installation."

The pertinent portion of that letter reads as follows:

"September 13, 1943.

"Southampton Apartments, Inc.,
"201 E. Plume St.,
"Norfolk, Va.

"Attention: Lt. Commander G. A. Massenburg,
President

"Dear Sir:

"I am directed by the Board of Supervisors of Elizabeth City County to advise you of the County's approval of undated plans submitted by you for the development designated as 'Southampton Apartments, Elizabeth City County, Virginia, G. A. Massenburg, President; W. Taylor Johnson, Secretary-Treasurer; 201 East Plume Street, Norfolk, Virginia; Bernard B. Spigel, Architect, Norfolk, Virginia,' upon the following conditions:

"(a) That the sanitary sewer and outfall system, in accordance with plans approved by the Hampton Roads Sanitation District Commission under date of September 9, 1943, be laid down by and at the expense of Southampton, Inc., to specification and final grades approved by the County and under inspection of the County *at the standard County inspection and maintenance fee for this type of institution.* Upon completion of the aforesaid requirements the County agrees to accept said sanitary sewer and outfall system for permanent maintenance." (Italics ours.)

Upon receipt of this letter, Captain Massenburg went to see Gibson to have explained to him exactly what was meant by the language "at the standard County inspection and maintenance fee for this type of installation." Gibson told him, "It means the fee that everybody else in like circumstances is paying." Massenburg replied, "We have no objection to paying the same thing other people in our situation are paying." Gibson then said, "I want you to know exactly what it is so we will go back and see Mr. Sours, and he will give you the details of the charge." They then went to the office of W. B. Sours, the county executive. After stating the purpose of their visit, Sours explained to Captain Massenburg definitely that the above language meant he would be required to pay $5 for each fixture or connection, $30 for a building permitting ten connections, and beyond that $5 per connection, and that the short way of figuring the fees was to charge $5 per fixture and allow a credit of $20 a building.

Sours, who left the county employ in 1944, testified as follows:

"Q. In September, 1943, you were County Executive of this County?

"A. Yes.

"Q. Do you recall anything occurring between you, Mr. Gibson and Commander Massenburg relative to the charges that would be made with regard to the South Hampton Apartment buildings?

"A. Yes, sir.

"Q. Tell the Court and jury about it, please, sir.

"A. Mr. Gibson and Captain Massenburg came into my office relative to what the fees would be, the county fees, would be, making taps to sewer lines proposed in the South Hampton Apartments development. The information I gave Captain Massenburg at that time was that, as I understood the ordinance, general ordinance, $50 per building permitting ten connections to the sewer line, and that a building larger than ordinary buildings requiring more outlets that a $5 additional fee for each opening was required under the ordinance, that where the developer had to extend or build the line, that the policy of the County was to charge $30 for the building, permitting ten connections, and beyond that $5 per connection. At the particular time I explained that to Captain Massenburg, I recall telling him that if he wished to verify that to get in touch with Mr. Crenshaw who was a member of the Board of Supervisors in the District that the apartments were located.

"Q. The way you have figured this bill is $5.00 per fixture and a credit of $20 a building, and that is the same thing?

"A. Yes.

"Q. That is the final way of figuring it?

"A. Yes, sir.

"Q. Are you certain you explained about the $5 fee per fixture to Captain Massenburg?

"A. Yes, I am very confident. I recall it very clearly. As a matter of fact, we had quite a few other developers at the time that were desirous of similar conditions. As a matter of fact, some of the others were complaining at the time, and I gave it very careful attention, was very careful in giving out the information so there would be no misunderstanding. I went so far as to explain that the County levied no tax fee for sewer upkeep and maintenance and that the money, outside of 50 cents for each fixture, went to the County in a special fund set up by the Board of Supervisors

to maintain and keep up the sewers so long as those funds were available.

"Q. You have no interest in this matter one way or the other, have you?

"A. No, none whatsoever."

In connection with his negotiations with Gibson and Sours, the testimony of Captain Massenburg was as follows:

"Q. You remember very well seeing Mr. Gibson about it when the letter was either mailed you or handed to you?

"A. Yes.

"Q. You wanted to know what the standard charges were?

"A. Yes.

"Q. And so he took you to Mr. Sours?

"A. Yes.

"Q. And Mr. Sours explained to you what the standard charges were?

"A. Yes.

"Q. $5 apiece, were they?

"A. Yes.

"Q. You could not tell how many there would be because you didn't know how many bath tubs, and so forth, you would have in this affair?

"A. That is correct.

"Q. And you could not add up the $5 to make a grand total?

"A. That is right.

"Q. Because you didn't have the plans?

"A. Yes.

"Q. $5 was discussed, and he told you that was the amount other people were paying?

"A. Yes.

"Q. And you agreed to it?

"A. Yes.

"Q. And they told you what was meant by these words, 'Standard fees,' what it meant?

"A. Yes.

"Q. And they proceeded on that theory and built these houses and your sewerage system?

"A. Yes.

"Q. And made no complaint on the subject one way or the other, until after you got a bill for a large amount of money, to-wit, for $7,480 I believe?

"A. Yes.

"Q. And after you got the bill for $7,480, you asked to be heard by the Board, to come before the Board?

"A. There was some discussion among the partnership. I am a very limited partner, and the fact that I am president doesn't mean that I govern the policies of the South Hampton Apartments. I want to make that clear.

"Q. When you got the bill you didn't make any kick, did you?

"A. I turned these things over to people to dispose of for us.

"Q. As far as you know, it was perfectly just?

"A. As far as I know. I raised no questions about it.

"Q. And you haven't raised any question up to date?

"A. No.

"Q. And you would not say at this minute it is too much?

"A. Whether it is too much, or not, I don't think it is a question I can pass on. I agreed to the proposition and I don't want to be put in position of going back on my agreement with Mr. Gibson. As far as his testimony is concerned, it concurs 100 per cent with what I would have to say. As to the law in the case, that is a different question."

The statement of the explanation by Gibson and Sours to Captain Massenburg was confirmed by Gibson. Captain Massenburg, in turn, frankly and fully confirmed the statements of both Gibson and Sours.

The above letter of September 13th was further considered by the Board of Supervisors on November 3, 1943, and the Board, on that day, by resolution, approved and con-

firmed the agreement therein made, and duly entered the resolution and the letter as a part of its record in its minutes.

The Board of Supervisors, on October 1, 1941, had adopted the following resolution:

"WHEREAS this Board has been forced to discontinue operation of W. P. A. projects for the installation of Sanitary Sewers because of the inavailability of relief labor, and

WHEREAS various subdividers of property are desirous of obtaining Sanitary Sewage facilities at this time.

Now, THEREFORE BE IT RESOLVED, ON MOTION of Mr. Crenshaw duly seconded and unanimously adopted that this Board establish and it hereby does the following policy for sanitary sewage installations in Wythe District by individuals or corporations desiring to construct additions or extensions to county sewer mains:

1. All costs of *construction* any such proposed sewage addition or extension are to be *born* by the applicant.

2. The sum of $25 is to be paid the County of Elizabeth City for each connection made on any such line for maintenance and upkeep of said line and the sum of $5 is to be paid by the applicant to the County of Elizabeth City as a sewer· inspection fee.

3. All sewers constructed under this policy shall be constructed under the supervision of the plumbing inspector of this County and all work must have his approval."

On May 6, 1942, in view of changing conditions, the Board of Supervisors enacted an ordinance relating to the business of plumbing and the regulation of connections with sewers. Section 47 of this ordinance provides as follows:

"That in view of the fact that such sewer systems as are hereby taken over by the County, have been built under different conditions, and consequently the costs of upkeep will necessarily be different, and greater in some systems than in others, on account of differing terrain and other causes, the Board of Supervisors is unable to fix a permanent uniform rate for connection, which will apply to all sections of the County at all times; therefore the said Board of Supervisors hereby sets the following temporary rates to be charged in said systems; in East Hampton Sanitary District

the minimum charge for connection shall be the sum of $50.00, which shall include the fee hereinafter provided to be paid to the Sewer Inspector, and which said charge will allow the connection of one building to the County sewer with not more than ten fixtures or openings in the sewer or waste line. An additional connection fee of $5.00 shall be paid for each fixture or opening in the sewer or waste lines, in excess of ten, provided there shall be no fee charged for openings left for cleanouts. In Buckroe Sanitary District, in the territory served by the Pear Avenue Sewer, in the territory served by the River View Sewer, the same temporary rates shall prevail as above set forth for East Hampton Sanitary District. In the territory served by the LaSalle Avenue Sewer the same rates shall also prevail, provided that in cases in said territory where connection has to be made to any already existing lines which connect with the public sewer, the charge shall be the same as that made to others connecting with such private sewer. * * * ."

On February 15, 1944, the Board of Supervisors was notified that the sanitary sewer and outfall system of the defendant had been completed at the cost of the defendant, in accordance with the plans, and an inspection and approval were requested of the Board. Inspection was had by the county plumbing inspector, and a bill for $7,480 was sent to the defendant by the county. The defendant took exception to this statement as being in excess of what had been expected of it and asked for a reference to the authority for the charge. It claimed that it was only required to pay "at the standard County inspection and maintenance fee for this type of installation," the sum of $25 for each connection on the sewer line, plus an inspection fee of $5 for each such connection, a total of $30 for each of its thirty buildings, under the resolution of the Board of Supervisors of October 1, 1941.

A conference was had by Captain Massenburg and counsel for the defendant with the Board of Supervisors. The Board, after consideration, unanimously refused to reduce the charge, and advised the defendant that it would be ex-

pected to make payment according to the terms of the contract stated in the letter of September 13, 1943, accepted by the defendant, and adopted and ratified by the Board. The refusal of the Board to reduce the fees was further based on the ground that to do so would produce a lack of uniformity in the rates charged to other developers for similar types of installation under similar circumstances.

The defendant, by letter, advised the county that it would, under protest pay the amount of its bill, and would forward a check covering same cotemporaneous with the delivery of a deed to the county for the sewerage system. The parties were unable to agree upon the terms of the deed. The check was never sent and the defendant later refused to make payment.

It appears from the evidence that Gibson was, from the beginning, authorized to conduct negotiations on behalf of the Board of Supervisors.

Gibson testified that the purpose of the October 1, 1941, resolution of the Board of Supervisors was to provide rates for sewerage connections by ordinary dwellings; that later when the question of sewerage service to apartment houses came up it was necessary for the Board to adopt a general policy with regard to such buildings, a somewhat new type of building construction in the county during the war emergency; that he was directed to follow the rates provided in the 'ordinance of November, 1942; and that this was thereafter followed in all instances.

The housing project of the defendant is located in the LaSalle Avenue District. All other large housing projects of a similar nature in the county had been charged and had paid the identical rates set out in the agreement with the defendant.

The county instituted this suit by notice of motion on June 22, 1945. The motion contained two counts, one for $8,195, covering 1639 fixtures in the 30 buildings at $5 per fixture, less a credit of $20 per building, or $600, leaving a net maintenance and inspection fee amounting to $7,595. The second count was for $7,480 for fixtures in 29 build-

ings, alleged to be due by agreement and accord between the parties. The county being unable to show accord and satisfaction, the trial court struck its evidence on the second count, and we are not here concerned with that count.

The evidence was submitted to the jury upon a single instruction, given over the objection of the defendant:

"The Court instructs the jury that if they believe from the evidence that the defendant contracted with the plaintiff to pay to plaintiff $5.00 per fixture, then the jury should find for the plaintiff for $7,595.00, and may allow interest thereon from the time they believe from the evidence it was due."

The jury returned a verdict in favor of the county for the sum of $7,595, which was approved and entered over the defendant's objection.

The county has moved to dismiss this writ of error on the ground that it does not assign errors as required by Virginia Code, 1942 (Michie), section 6346, and Rule XIV of this court.

The motion is without merit. It is true the petition for the writ of error does not, in precise terms and form, comply with the above statute and rule; but it does clearly allege that the trial court erred in holding, as a matter of law, that a binding contract was made to pay a fee in excess of the scale prescribed by an applicable ordinance, and in refusing to allow the jury to determine what was the agreement on which the minds of the parties met; that is, whether the agreement was to pay the correct amount specified by an alleged applicable ordinance, or was based upon a definite contract, if the county had the capacity to contract at a rate above the applicable ordinance.

The contentions of the defendant are refuted by the undisputed facts and the law.

In furtherance of its purposes the Board of Supervisors of a county may employ agents and servants to do what the Board has authority to do, and to perform acts and enter into contracts which the Board, in the exercise of its discretion, has approved. Anyone dealing with its officers

and agents must, at his peril, ascertain the nature and extent of their authority.

Virginia Code, 1942 (Michie), section 1544, provides:

"The councils of the several cities and towns and the boards of supervisors of the several counties of the State, may adopt such rules and regulations not inconsistent with the laws of this State, as may be necessary to secure the sanitary construction, alteration, and inspection of plumbing and sewer connections and drains, * * * ."

Virginia Code, 1942 (Michie), section 2743, in part, provides:

"In addition to the powers conferred by other statutes, the board of supervisors of every county shall have power:

" * * *

"To adopt such measures as they deem expedient to secure and promote the health, safety and general welfare of the inhabitants of their respective counties not inconsistent with the general laws of this State."

Virginia Code, 1942 (Michie), section 2757, expressly gives the county authority to contract as to sewerage:

"The board of supervisors of any county shall have power to establish and maintain, or to cause to be established and maintained, public sewers and public water mains along the streets, alleys and public highways in any incorporated town, village or suburbs of any city where the same shall be necessary whether the title to said streets, alleys and public highways be vested in the board of supervisors or not, to protect the public health, and the owners of adjacent lands shall have the right to connect their premises with such sewers and water mains on such terms as the board of supervisors shall prescribe * * * ."

Unquestionably a county is capable of contracting and has the power to make all contracts which are proper and reasonably necessary to the execution of its corporate objects and purposes. 20 C. J. S., Counties, sec. 173, p. 1006; 14 Am. Jur., Counties, page 209. Whatever authority the county may originally exercise, it also has the power to ratify. 20 C. J. S., Counties, sec. 194, p. 1030; 14 Am. Jur., Counties,

page 554. General rules of the law of contracts are applicable in determining the validity of a contract to which a county is a party.

Defendant contends that it was for the jury to say whether Captain Massenburg agreed that his corporation would pay a "standard inspection and maintenance fee" according to what fee was, in fact, prescribed by ordinance, or the fee stipulated by the representatives of the county.

The evidence of Captain Massenburg does not support any inference that he had in mind any other fees or charges except those specifically stated to him by the representatives of the county, and confirmed by the Board of Supervisors. He unqualifiedly expressed his entire agreement with the evidence of Gibson and Sours, without any reservation or qualification whatever as to the facts. Besides, it is apparent the agreement was based on fees which are prescribed in the ordinance of 1942, covering similar types of sewer installations in Elizabeth City county.

In answer to the suggestion that section 47 of that ordinance applied only to existing sewers, the answer is that the Board of Supervisors had the right by contract to make the same rates apply to connections with similar types of sewers to be constructed in the future.

The contract with the defendant is not in conflict with the 1942 county ordinance, which was adopted in furtherance of the general policy of the county towards the maintenance of sewers for projects similar to the one involved here. In an unusual time, the project of the defendant was a new one, in connection with which the county could make a contract for the maintenance of sewers or refuse to do so. Before agreeing to enter into the contract, it expressly and specifically undertook to make the nature and amount of the fees to be charged plainly understood.

With definite and exact information as to the precise fees and charges, the defendant was in a position to know better than anyone else the charge against it for sewerage maintenance and service for each unit of its project. There was no ambiguity in the statement and explanation made by

Gibson and Sours of the meaning of the words "at the standard County inspection and maintenance fee for this type of installation." Captain Massenburg frankly stated that the rates and fees were clearly understood by him and that he agreed they were entirely satisfactory to his corporation. If the defendant thought the charges were excessive, or not in accordance with the standard paid by others for similar projects, good faith required that it should have made complaint prior to entering into its agreement with the county. It had ample opportunities to investigate the matter during the negotiations preceding the making of the contract.

The defendant has been charged with what other persons similarly situated may be required to pay, and, in no sense, has been denied the equal protection of the law. The agreement it entered into specifies every element of a valid and binding contract. For a valuable consideration the county has assumed the large responsibility of maintaining forever a sewerage system serving a large number of buildings and persons.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*