## Richmond

COUNTY OF YORK

V.

KING'S VILLA, INC.

December 2, 1983.

Record No. 810497.

Present: All the Justices.

*Cecil G. Moore (Darrell J. Miller; Moore, Moore & Bradberry,* on brief), for appellant.

*Harry J. Kostel (Marla J. Melman; Jones, Blechman, Woltz & Kelly, P.C.,* on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal focuses upon the power of a county administrator to execute a contract that binds the county for which he works.

In January 1977, Richard E. Bain, then the York County Administrator, signed, purportedly on behalf of York County, a contract titled "County of York, Subdivision Agreement." The contract was countersigned on behalf of King's Villa, the other party thereto, by its president. In addition, the contract was signed by

the York County Attorney on a signature line marked: "Approved as to form."

The contract contains many recitals and conditions, but crucial among these for the purpose of this appeal is the following language contained in paragraph 4:

> In the event County does not undertake to construct a permanent pump station or does not complete the construction of the permanent pump station on or before January 1, 1979, then and in that event, Owner agrees to build a permanent pump station in accordance with the plans and specifications and in the location as shown which the County now has on file; provided however, that any costs of construction of the permanent pump station by Owner in excess of $50,000 shall be reimbursed immediately up to the amount of tap fees upon payment of such tap fees chargeable on Sections 1, 2, 3 of King's Villa Subdivision. *Such tap fees shall be $700.00 for each structure to be connected to the sewer.*

(Emphasis added.) The last sentence lies at the bottom of this dispute. The County argues that by including the italicized language in the contract, the County Administrator attempted to lock the connection fee in place and by that attempt intruded into an area exclusively reserved for the County Board of Supervisors.

At the time the contract was signed, the connection fee, as set forth in the County's wastewater ordinance, was $700.00 per structure the same figure as recited in the contract. However, in June 1977, five months after the date of the contract, the York County Board of Supervisors amended the wastewater ordinance and increased the connection fee to $1,250.00. The County attempted to collect the new fee from King's Villa. But King's Villa refused to pay more than $700.00 per connection and filed suit to enjoin the County from collecting the increased fee and to force it to abide by the January 1977 contract.

The trial court agreed with King's Villa, enjoined the County from charging the increased fee, ordered the County to charge the $700.00 fee contained in the January 1977 contract, and directed the County to return to King's Villa any amounts in excess of $700.00 per connection which had already been collected.

The County appealed, claiming that its Administrator had no power permanently to set the connection fee at $700.00 per con-

nection and that to that extent the italicized portion of the January 1977 contract, quoted above, is void and of no effect. We agree. Therefore, we will reverse the decision of the trial court and enter final judgment for the County.

The power to fix or change the connection fee rests exclusively in the York County Board of Supervisors. This is true whether the Board of Supervisors acts in its capacity as the Board of Supervisors, Code § 15.1-320(7), or in its capacity as the governing body of a sanitary district, Code §§ 21-118(5) and 21-118.4(e). In *Armstrong* v. *Henrico County,* 212 Va. 66, 77, 182 S.E.2d 35, 43 (1971), we held that setting rates and fees for sewer or water services is a nondelegable legislative function. Thus, the only way the connection fee could have been locked in place indefinitely was for the County Board of Supervisors to authorize such expressly. It could have done this by adopting a resolution to that effect, by ratifying the portion of the contract related to the connection fee, or by other express means.

Here, the County Administrator tried to do more than he was empowered to do. He never had the authority permanently to fix rates and fees. Neither the York County Board of Supervisors nor the governing body of the sanitary district could have authorized the County Administrator to freeze rates and fees indefinitely even if they had wanted to.

King's Villa is in the unfortunate position of having dealt in good faith with a public servant who exceeded the bounds of his authority. This is not an uncommon problem nor is it one which engenders goodwill on the part of citizens for governmental officials with whom they must deal. For it is true that where, as here, a contract was prepared by the County Administrator and approved as to form by the County Attorney, a citizen might easily conclude, without further inquiry or investigation, that every part of the contract was legal and binding and could be relied upon. However, we have cautioned in several cases that those who deal with public officials must, at their peril, take cognizance of their power and its limits. *Deal* v. *Commonwealth,* 224 Va. 618, 623, 299 S.E.2d 346, 349 (1983); *S. H. Apts.* v. *Elizabeth City Co.,* 185 Va. 67, 78-79, 37 S.E.2d 841, 846 (1946).

The rule of caution repeated above is the outgrowth of competing and conflicting demands. On one hand, the law favors contracts and attempts to uphold and enforce them wherever possible. On the other hand, our system of government is designed to re-

strain public officials from having unfettered, unchecked control over governmental affairs. This means that there are limits on the powers of the various levels of government and curbs on the powers entrusted to agents of government. Were we to rule in favor of King's Villa we would rend the fabric of government because we would be permitting the judgment of one official to supplant the collective wisdom of the elected governing body whom the people have chosen to wield the power here in dispute. Instead of having rule by the Board of Supervisors we would be allowing rule by one man, who in the final analysis is but an employee of the Board. Such a result is unacceptable under our form of government.

The arguments advanced by King's Villa in support of the contract are not persuasive, and are easily disposed of. King's Villa fails to point to any express authority on the part of the County Administrator to set in place for all time a connection fee of $700.00. Instead, it argues that on the bases of the York County Subdivision Ordinance and Code § 15.1-117, Bain had the implied authority to so bind the County.

It is plain that neither the ordinance nor the Code gives rise to the implication urged by King's Villa. The Subdivision Ordinance states as follows with regard to the role of the County Administrator:

> The County Administrator for the County of York or his duly authorized agent is hereby appointed Subdivision Agent and shall on behalf of the Board, administer and enforce the provisions of this ordinance.

There is nothing in the ordinance concerning the permanent setting of connection fees.

Code § 15.1-117(14) is likewise of no avail. It merely provides the County Administrator is "[t]o perform such other duties as may be imposed upon him by the governing body." The short answer is the Board of Supervisors could not and did not give Bain the authority permanently to fix the connection fee.

In oral argument, King's Villa's counsel contended that Code § 15.1-466(J) provides a basis for implying that Bain had the power to bind the County to a fee of $700.00. As far as we can discern, however, counsel misspoke. Code § 15.1-466(J) has no relation whatever to setting the connection fee. It merely provides that a subdivision ordinance shall include reasonable regula-

tions for payments by subdividers and developers of their pro rata share of the cost of providing reasonable and necessary sewerage and drainage facilities. This gave Bain no power, expressly or by implication, permanently to fix the sewer connection fee in a contract.

King's Villa also argues that the County is estopped to deny the contract. Yet the doctrine of estoppel has no application here. We explained in *Deal* v. *Commonwealth, supra,* that where a contract executed by an agent of the government is *ultra vires* it is void *ab initio* and of no legal effect; thus no performance by either party thereto can give the unlawful contract validity or serve as the basis of any right of action upon it and the doctrine of estoppel has no application. 224 Va. at 623, 299 S.E.2d at 348-349. *Accord School Board* v. *Burley,* 225 Va. 376, 379, 302 S.E.2d 53, 55 (1983). *See Richmond R. Co.* v. *Richmond, etc.,* 145 Va. 266, 299, 133 S.E. 888, 898 (1926).

*Reversed and final judgment.*

RUSSELL, J., dissenting.

The majority opinion relies on *Armstrong* v. *Henrico County,* 212 Va. 66, 77, 182 S.E.2d 35, 43 (1971), for the proposition that the setting of sewer rates and fees is a nondelegable legislative function. It then reasons that since the County Administrator set the $700 tap fee in this case, having no authority to do so, the subdivision agreement is void to that extent. This conclusion is based upon the erroneous premise that the Administrator set the fee. The Administrator did not set the fee. The York County Board of Supervisors set the $700 tap fee as a part of its "Wastewater Ordinance," adopted on January 12, 1976, more than a year before the subdivision agreement in issue was executed. The real question before the Court is whether the Board was bound by the contract which the Administrator executed as its agent.

York County's subdivision ordinance appoints the County Administrator the county's "Subdivision Agent" and provides that he "shall, on behalf of the Board, administer and enforce the provisions of this ordinance." The ordinance further requires that he approve a subdivision plat only after the subdivider has either (1) completed all improvements on the plans, or (2) entered into an

agreement with the county accompanied by a bond covering 100% of the cost of required improvements not yet completed.

The subdivider in this case chose to satisfy this requirement by entering into an agreement with the county accompanied by a bond covering 100% of the cost of required improvements not yet completed. The $700 tap fee, which the majority finds unauthorized, appears in this agreement. As a prerequisite to approval of the plat, the subdivider was required by the ordinance to execute the agreement, and the County Administrator was required by the ordinance to enforce the provision requiring the agreement.

The subdivision agreement between the parties assures the completion of the required improvements and indemnification for the county. It recites that the subdivider has posted sufficient collateral to guarantee the maintenance of a temporary pump station until it is replaced by a permanent pump station. It also states that the subdivider has posted further surety in the amount of $125,000 guaranteeing the construction of a permanent pump station on or before April 1, 1977. Paragraph 4, in which the $700 tap fee appears, states:

> In the event county does not undertake to construct a permanent pump station or does not complete the construction of a permanent pump station on or before January 1, 1979, then and in that event owner agrees to build a permanent pump station in accordance with the plans and specifications and in the location shown which the county now has on file; provided however, that any costs of construction of the permanent pump station by owner in excess of $50,000 shall be reimbursed immediately up to the amount of tap fees upon payment of such tap fees chargeable on Sections 1, 2, and 3 of King's Villa Subdivision. Such tap fees shall be $700.00 for each structure to be connected to the sewer.

Thus, the $700 fee is an integral part of the "cost of required improvements" mandated by the ordinance to be a part of a binding agreement between the subdivider and the county.

The subdivision ordinance provides that when the subdivider has complied with the provisions of the ordinance, the subdivision agent shall grant provisional approval to the plat, which action "shall be binding on the governing body, through its agent."

The Administrator, having been authorized to enter into subdivision agreements as the governing body's "Subdivision Agent," merely set forth in the agreement the connection fees then required by the applicable ordinance. Indeed, he would have had no authority to specify any different fees. After he signed the agreement on behalf of the county, it was endorsed "Approved as to form" by the County Attorney.

There can be no doubt of the Administrator's authority to enter into such contracts. Code § 15.1-320 provides:

> [T]he governing body of any county . . . shall have power and authority: . . . (6) To enter into contracts with . . . any person, firm or corporation . . . providing for or relating to the treatment and disposal of sewage and industrial wastes.
>
> (7) To fix, charge and collect fees, rents or other charges for the use and services of the sewage disposal system.

In *S. H. Apts.* v. *Elizabeth City Co.,* 185 Va. 67, 78, 37 S.E.2d 841, 846 (1946), we said: "In furtherance of its purposes the Board of Supervisors of a county may employ agents and servants to do what the Board has authority to do, and to perform acts and enter into contracts which the Board, in the exercise of its discretion, has approved." Reviewing the statutory powers of governing bodies, we specifically held that a Board of Supervisors, *acting through its designated agent,* might enter into binding contracts with developers with respect to sewer service fees. Such a contract was enforced against a developer in *S. H. Apts. Id.* at 81, 37 S.E.2d at 847.

A contract enforceable against one party is equally enforceable against the other. There is no doctrine of sovereign immunity in the law of contracts; a governing body is as accountable for breach of a valid contract as any other party would be.

The majority opinion appears to focus upon the theory that the subdivision agreement had the effect of freezing the sewer connection fees at $700, insofar as Sections 1, 2, and 3 of King's Villa were concerned, and that binding the governing body to that figure somehow impaired its sovereign legislative power to adopt a different schedule of fees. I see no basis for such a concern. No legislature can bind its successors to leave the law unchanged. The Board of Supervisors was free to *increase* sewer connection fees at any time, whether it had entered into a contract concerning such

fees or not. The new fees would apply to all citizens affected thereby. The Board would remain subject to equitable sanctions or responsive in damages for any breach of contract it might thus commit, but its sovereign powers would be unimpaired. Indeed, any other view would offend the constitutional provisions proscribing legislation which impairs the obligation of contracts. U.S. Const. art. I, § 10; Va. Const. art. I, § 11; *see also Shoosmith* v. *Scott,* 217 Va. 290, 227 S.E.2d 729 (1976).

In pursuance of their complex responsibilities, governing bodies must enter into contracts on countless subjects with a wide variety of private parties. In nearly all such cases, they act through designated agents, as our decisions and the applicable statutes authorize them to do. If the subject of such an agreement is within the contractual competence of the governing body, it is usually also within its legislative power. The majority's reasoning would, by extension, imperil every contract entered into by or on behalf of a governing body concerning any subject matter upon which it might validly legislate. But it is of vital importance, both to governing bodies and to the citizens who must deal with them, that their contractual engagements be respected. The proper view, it seems to me, is to leave the governing body free to amend its ordinance at any time, but to preserve the enforceability of its contracts, and its liability in damages for their breach, notwithstanding such change.

For these reasons, I would affirm.

COCHRAN, J., joins in dissent.