334 S.E.2d 633

**Edward MARTIN**

v.

**Robert PUGH, as Chief of Police, City of Chester, West Virginia; Perry E. Ross, as Mayor, City of Chester, West Virginia; Charles Kology, Roy Cashdollar, Frank Decapio, Robert Stoneburner, and Kenneth Williams, all as Members of the City Council of the City of Chester, West Virginia; and the City of Chester, West Virginia.**

**No. 16500.**

Supreme Court of Appeals of West Virginia.

Submitted April 23, 1985.

Decided June 6, 1985.

Rehearing Denied July 10, 1985.

James J. Sellitti, Sellitti & Nogay, Weirton, for appellee.

George J. Anetakis and Suzanne Belot, Volk, Robertson, Frankovitch & Anetakis, Weirton, for appellants.

McHUGH, Justice:

This case is before this Court upon the petition of the appellants, the chief of police, mayor and city council of the City of Chester, West Virginia, for an appeal from the final order of the Circuit Court of Hancock County, West Virginia, entered on June 27, 1984.[1] By that order the circuit court affirmed the final order of the policemen's civil service commission for the City of Chester [hereinafter, "the commission"], dated October 11, 1983. The commission's order determined that the appellee, Edward Martin, was entitled to the status of full-time, as opposed to part-time, police officer of the City of Chester [hereinafter, "the city"] as of the date of his hiring (October 21, 1977)[2] but that, due to his failure earlier to pursue his grievance and the resulting prejudice to the city, he would not be entitled to the wages, insurance premium payments, retirement contributions, holiday

1. By order entered on August 14, 1984, the circuit court denied the parties' respective "motions to alter or amend" the judgment entered on June 27, 1984.

2. The commission's order recognized that, under *W.Va.Code*, 8–14–11 [1981], the appellee's "appointment" became "absolute" at the conclusion of the one-year probationary period, that is, on October 21, 1978.

pay and sick leave he would have received as a full-time officer working 40 hours per week, until the week of November 17, 1982.

Before the circuit court and this Court the appellee cross-assigns and briefs as error the determination that he is not entitled to the back wages and benefits prior to November 17, 1982.

This Court has before it the petition, all matters of record, and the briefs and argument of counsel. We believe that the orders of the commission and of the circuit court were based upon mistakes of law and consequently we reverse.

## I

The commission's findings of fact are essentially uncontroverted, except as otherwise noted hereinafter. A rather detailed statement of these facts is set forth to clarify the application of legal principles.

### A. FACTS

In 1976, the city, through the policemen's civil service commission, established the practice of giving two eligibility tests, one for full-time officers, the other for part-time officers.[3] The full-time examination is more difficult, but there is no difference in the actual duties of full-time and part-time officers. Full-time officers are, however, provided with higher pay, health insurance benefits, retirement fund contributions, paid vacation days, and paid sick leave, whereas part-time officers are not.

The appellee took both tests on July 30, 1976, receiving a passing score on both.[4] On May 4, 1977, the appellee again took both examinations, passing the part-time but failing the full-time test. The appellee's passing score on the first full-time

test placed him in sixth position of those passing that test, and in ninth position of those who passed either the first or second full-time test. The appellee's passing score on the first part-time test placed him in sixth position of those passing that test. His passing *score* on the second part-time placed him in a tie for second position among those passing that test and in a tie for fifth position of those who passed either the first or second part-time test (excluding David Winters—see below).

Only David Winters has at any time since these tests been appointed as a full-time officer. Officer Winters was in first position of all those who took the full-time test in 1976 or 1977. (Winters also took the part-time test, in 1976, and scored the highest).

On October 21, 1977, the city hired the appellee as a part-time officer. He was scheduled to work two days per week and was on call to substitute as needed.

At all relevant times the city has maintained three officers denominated as full-time, one of whom is the chief of police. It has maintained a varying number of part-time officers.

The official minutes of a regular meeting of city council held on July 1, 1978, indicate that the appellee was, at that meeting, "appointed" as a full-time officer. City officials testified that these minutes involve a clerical error insofar as the appellee's appointment as a full-time police officer is concerned. The commission found the city's testimony unpersuasive and insufficient to overcome the presumption that the minutes are correct. This finding is not clearly wrong.

---

**3.** Pursuant to *W. Va. Code*, 8–14–21 [1969], the voters of the city, a Class III city, elected to have the same policemen's civil service coverage that is applicable to the paid police departments of Class I and II cities.

**4.** Our reference in any part of this opinion to full-time or part-time competitive examinations, full-time or part-time police officers, or the like, does *not* indicate that we have inferentially decided that a municipality subject to the Police Civil Service Act *is* authorized to have a paid police department with both full-time and part-

time police officers. As stated in section III C of this opinion, *infra*, we simply leave that question to another day, when resolution of that issue is necessary to decide the case, which is not the situation here. On the other hand, if we were to discuss only the appellee's *full-time* test results, the implication would be that a municipality subject to the Police Civil Service Act is *not* authorized to have a paid police department with both full-time and part-time police officers. Again, we do not decide the question either way.

After July, 1978, the appellee began working 40 hours per week but at part-time hourly wages instead of on a salaried basis. Apparently the city also began paying the appellee's health insurance premiums at this time.

On July 1, 1979, the appellee was informed that he would be returned to only two days per week and that the city would no longer pay for his insurance.

The appellee initiated a mandamus proceeding in the Circuit Court of Hancock County in 1979, seeking an adjudication that he was a full-time policeman and entitled to the benefits and protection of chapter 8, article 14 of the West Virginia Code. This case was dismissed because of the appellee's failure to exhaust his administrative remedies, that is, to have his grievance first heard by the policemen's civil service commission.

In August, 1979, the city returned the appellee to a five-day, forty-hour week.

On March 21, 1981, the appellee signed a statement purporting to acknowledge that he was neither a full-time officer nor entitled to the benefits of the so-called Police Civil Service Act.

On November 17, 1982, the city again reduced the appellee to two days (16 hours) per week, and on December 22, 1982, the mayor informed the appellee in writing that the reason for the reduced hours was

that other part-time officers were more readily available. City officials testified that they also wished to apportion more evenly the available work among their part-time officers.

Pursuant to *W. Va. Code*, 8–14–20(a) [1980],[5] the appellee thereafter filed a grievance (and later an amended grievance adding city officials) seeking review by the policemen's civil service commission, not only of the city's November 17, 1982 action, but of all other relevant actions by the city since his hiring.

### B. THE COMMISSION'S ORDER

The commission ruled that *W. Va. Code*, 8–14–1 [1969][6] contemplates only two types of police departments, first, those "paid police departments" with only full-time officers and second, those police forces with only voluntary or hourly officers. Thus, the commission was of the opinion that hybrid police departments having both full-time and part-time officers are not authorized by statute. Hence, not having *only* hourly officers, the city, according to the commission, may not lawfully hire *any* part-time police officers but must designate all officers as "full-time" and give only "full-time" officer examinations. The commission emphasized that the duties of full-time and part-time officers are the same under *W. Va. Code*, 8–14–6 [1969].[7]

---

5. *W. Va. Code*, 8–14–20(a) [1980], provides in pertinent part as follows:

> No member of any paid police department subject to the civil service provisions of this article shall be ... reduced in rank or pay except for just cause, ...; and no such member shall be ... reduced except as provided by the civil service provisions of this article, and in no event until he shall have been furnished with a written statement of the reasons for such action.... If the member sought to be ... reduced shall demand it, the commission shall grant him a public hearing, ... At such hearing the burden shall be upon the ... reducing officer, ... to show just cause for his action, and in the event [he] fails to show just cause for his action before the commission, then the member ... reduced shall be reinstated with full pay, forthwith ..., for the entire period during which he may have been prevented from performing his usual employment, ...

6. The second paragraph of *W. Va. Code*, 8–14–1 [1969], provides:

> For the purposes of this article, the term "paid police department" shall be taken to mean only a municipal police department maintained and paid for out of public funds and whose employees are paid on a full-time basis out of public funds. The term shall not be taken to mean a department whose employees are paid nominal salaries or wages or are only paid for services actually rendered on an hourly basis.

7. The term "member of a paid police department" ... shall mean ... any individual employed in a paid police department who is clothed with the police power of the State in being authorized to carry deadly weapons, make arrests, enforce traffic and other municipal ordinances, issue summons for violations of traffic and other municipal ordinances, and perform other duties which are within the scope of active, general law enforcement.

Consequently, it reasoned that a test which is sufficient to put an armed policeman on the streets of the city with full police power must be deemed sufficient for appointment to the city's police force. Therefore, the commission ruled that the appellee, who on both occasions passed the test denominated as the part-time test, was thereby eligible for appointment on the basis of those tests, without regard to his scores on the tests denominated as full-time.

The commission did not concern itself with the appellee's rank relative to others who took the tests because the record does not reflect that anyone who scored higher than he did remained available for appointment.

In any event, the commission believed that the appellee's "appointment" as a full-time officer by city council became absolute at the conclusion of the probationary period thereafter, that is, on June 30, 1979, and the commission concluded that, if the city's act in so appointing was illegal, the city may not raise its own mistake as a defense.

Finally, however, the commission concurred with the city's argument as to laches barring an award of back benefits and, accordingly, disallowed back benefits prior to the week in which the appellee was last reduced and for which reduction he initiated the instant litigation to pursue his grievance as to full-time status.

## C. CIRCUIT COURT'S ORDER

The circuit court affirmed the commission's ruling and held that all parties were given a fair hearing.[8]

## II

Before this court the appellants assign several errors. Their principal assignments are: (1) inasmuch as the appellee did not rank in the top three of those taking the examination for appointment as full-time police officer, he was not eligible for appointment as such, nor was he ever certified as eligible; consequently he is not entitled to be classified as a full-time police officer under *W. Va. Code*, 8–14–15 [1969]; (2) city council's purported appointment of the appellee was a void act, since it was not in compliance with *W. Va. Code*, 8–14–15 [1969]; and (3) the city is entitled to designate its police officers as either full-time or part-time officers.[9]

## III

### A. JUDICIAL REVIEW

■ At the outset we note the scope of judicial review applicable in a case of this nature. In *Appeal of Prezkop*, 154 W.Va. 759, 179 S.E.2d 331 (1971), this Court held in syllabus point 1: "A final order of a police civil service commission based upon a finding of fact will not be reversed by a circuit court upon appeal unless it is clearly wrong or is based upon a mistake of law." In syllabus point 2 thereto we also held: "The judgment of a circuit court affirming a final order of a police civil service commission, upon appeal therefrom as provided by statute, will not be reversed by this Court unless the final order of the commission was against the clear preponderance of the evidence or was based upon a mistake of law."

■ Elsewhere we have distinguished between the scope of judicial review of conclusions of law, as opposed to findings of fact, by an administrative agency: " 'Findings of fact by the [administrative agency] ... should not be set aside unless such findings are plainly wrong; however,

---

8. The city had assigned as error the participation of a former commissioner who ruled only on procedural matters at the hearing before the commission and who had previously represented the appellee in the 1979 mandamus proceeding concerning the appellee's status as a police officer.

9. The appellant's other assignments of error are: (1) the appellee is barred by laches not only from being awarded back benefits but from attaining the status of full-time police officer; (2) the appellee failed to prove his damages with reasonable certainty; and (3) the participation of the appellee's former counsel as "legal advisor" to the commission denied the appellants their right to a hearing before an impartial tribunal. It is not necessary to address these assignments in light of our rulings on the principal assignments.

the plainly wrong doctrine does not apply to conclusions of law by the [administrative agency].' " Syl. pt. 1, *Lough v. Cole*, 172 W.Va. 730, 310 S.E.2d 491 (1983), quoting syl. pt. 1, *Kisamore v. Rutledge*, 166 W.Va. 675, 276 S.E.2d 821 (1981). Similarly, " '[i]n reviewing the judgment of a lower court this Court does not accord special weight to the lower court's conclusions of law, and will reverse the judgment below when it is based on an incorrect conclusion of law.' " Syl. pt. 1, *Pierce v. Pierce*, 166 W.Va. 389, 274 S.E.2d 514 (1981), quoting Syl. pt. 1, *Burks v. McNeel*, 164 W.Va. 654, 264 S.E.2d 651 (1980).

We now turn to the substantive law in this area.

## B. DETERMINATION OF STATUS

██ An important principle is that "[t]he [police] civil service statute should be followed as closely as possible in order to carry out the intent of the Legislature which enacted it." *Daniels v. McCulloch*, 168 W.Va. 740, 745, 285 S.E.2d 483, 486 (1981). It is well settled that " '[i]t is the legislative intendment of the police civil service act, [*W.Va.Code*, 8–14–6 to –23], to provide for a complete and all-inclusive system for the appointment, promotion, reduction, removal and reinstatement of all officers (except the chief of police), policemen and other employees of paid police departments....' " Syl., *id.*, quoting syl. pt. 5, *Dougherty v. City of Parkersburg*, 138 W.Va. 1, 76 S.E.2d 594 (1952). Indeed, several sections of the statute itself also provide that the legislative intent requires strict compliance with the exclusive process for appointments, etc. For example, *W.Va. Code*, 8–14–23 [1969], states in part: "It is intended by the civil service provisions of this article to furnish a complete and *exclusive* system for the appointment, promotion, reinstatement, removal, discharge, suspension and reduction of all members of all paid police departments subject to the civil service provisions of this article."

(emphasis added). Another example is *W.Va.Code*, 8–14–6 [1969]:

*All* appointments and promotions to all positions in all paid police departments [subject to the civil service provisions of this article] *shall* be made *only* according to qualifications and fitness to be ascertained by examinations, which, so far as practicable, shall be competitive, as hereinafter provided. No individual except the chief of police shall be appointed, promoted, reinstated, removed, discharged, suspended or reduced in rank or pay as a paid member of any paid police department, regardless of rank or position, of any [municipality subject to the civil service provisions of this article] *in any manner or by any means other than those prescribed in the following sections of this article.* (emphasis added)

A final example of the necessity for strict compliance with the statute is the key section involved in this case, namely, *W.Va. Code*, 8–14–15 [1969]:

*Every* position, unless filled by promotion, reinstatement or reduction, *shall* be filled *only in the manner specified in this section.* The appointing officer [10] *shall* notify the policemen's civil service commission of any vacancy in a position which he desires to fill, and *shall* request the *certification of eligibles.* The commission *shall* forthwith certify, from the eligible list, the names of the *three individuals* thereon who received the highest *averages* at preceding competitive examinations held under the civil service provisions of this article within a period of *three years* next preceding the date of the prospective appointment. The appointing officer *shall*, thereupon, with sole reference to the relative merit and fitness of the candidates, make an appointment from the three names so certified[.] (emphasis added)

It is clear that the appellee was never appointed to the entry level position of full-time patrolman in compliance with *W.Va.*

---

**10.** "Appointing officer" is defined by *W.Va.Code*, 8–14–6 [1969], to mean the "officer in whom the power of appointment of members of a paid police department is vested by charter provision or ordinance of the [municipality]." The parties hereto agree that, in this case, the "appointing officer" is the Mayor of the City of Chester, West Virginia.

*Code,* 8–14–15 [1969]. The appellee's *average* scores on the examinations did not place him among the top three candidates for *either* the full-time or part-time position. His scores on the two full-time tests were 71 and 58 for an average of 64.5, which places him well below third position (70 is a passing score). His scores on the two part-time tests were 81 and 86 for an average of 83.5, which average places him in sixth position.

■ Two points need to be made here. First, the statute, *Code,* 8–14–15 [1969], unmistakably requires an *average* score to be calculated and utilized for each candidate who takes the competitive examination for a police civil service position on more than one occasion during the three years next preceding the date of the prospective appointment. Stated another way, it is clear that a score on a given examination survives during such three-year period. Otherwise, the statute would have been worded to require the certification of eligibles composed of those three individuals who received the highest scores at the competitive examination next preceding the date of the prospective appointment. The commission and the circuit court concluded that the statute was to be read in this latter manner and since the appellee's score on the last part-time examination placed him in a second-place tie, he was eligible for appointment for the full-time position having the identical duties. This conclusion constitutes a "mistake of law" warranting reversal by this court. The statute does not authorize the commission to utilize only the last or the highest score, but, rather, the average scores.

■ Second, it was also a "mistake of law" for the commission and the circuit court to conclude from a silent record that those individuals having higher average ex-

amination scores than the person in question were no longer available for appointment. While the burden of proof under *W.Va.Code,* 8–14–20(a) [1980], is upon the "removing officer" to show just cause for removing, discharging, suspending or reducing a member of a paid police department subject to police civil service coverage, such subsection does not apply to an initial appointment. Instead, by its terms such subsection applies only to certain disciplinary action against a "member" of a paid police department subject to the Police Civil Service Act, and membership presupposes a valid appointment pursuant to the statute. The thrust of the initial appointment sections of the statute is for an applicant to show that he meets certain criteria, rather than the commission having to show that he does not meet the criteria. It follows that the burden of proof is upon a candidate for appointment to a police civil service position to show that other candidates having higher average examination scores are no longer available for appointment for one or more of the reasons outlined in *W.Va.Code,* 8–14–14 and –15 [1969].[11] It certainly would be unwarranted to presume that all of the higher-ranking candidates were no longer interested in the position, or were stricken from the list of eligibles after a hearing determined their unfitness for the position for one or more of the serious misbehavior reasons mentioned in section 14, or had been passed over at least three times in favor of lower-ranked individuals.

■ Thus, the appellee never satisfied the requirements of *W.Va.Code,* 8–14–15 [1969], for inclusion in the list of certified eligibles, even if his scores on the part-time examination are considered. Moreover, the commission in fact never certified the appellee as being in the top three, and the mayor, as the appointing officer, never se-

---

11. *W.Va.Code,* 8–14–15 [1969], provides that the appointing officer may make objection, to the commission, to one or more of the certified individuals, for any of the reasons stated in section 14. Some of these reasons are: addiction to intoxicating liquors or drugs; criminal behavior or notoriously disgraceful conduct; dismissal from public service for misconduct; fraudulent behavior with respect to securing the police civil service position. Should the appointing officer's objection be sustained by the commission, after a hearing (if requested), the commission must strike that individual's name from the list of eligibles and certify the next highest name. Section 15 also provides for a name to be stricken from the list of eligibles after it has been rejected three times in favor of a name or names below it on the list.

lected the appellee's name from the names so certified. In essence the appellee is in the untenable position of invoking the aid of the police civil service provisions without complying with such provisions. There must be strict compliance with the Police Civil Service Act, and *de facto* appointments, based upon mere performance of duties as a police officer, are not contemplated under such Act. Such *de facto* appointments would inevitably undermine the protections afforded by the police civil service provisions.

## C. FULL–TIME v. PART–TIME

Because the appellee's average scores on the part-time, as well as full-time, examinations are not sufficient to satisfy the requirements for certification by the commission, it is not necessary to, and we do not, address the issue of whether the statute (*Code*, 8–14–1 *et seq.*) authorizes municipalities to have paid police departments with both full-time and part-time police officers. *See* n. 4, *supra*.

## D. CITY COUNCIL'S ACTION

■ On the other hand, it is necessary to discuss the validity of the appellee's "appointment" by city council upon "recommendation" of the mayor, "as a full-time officer at hourly wages of three dollars." [12] As discussed above, the exclusive procedure for appointment required by *W. Va. Code*, 8–14–15 [1969], was not followed in this case. Consistent with the statutory and case law principle of strict compliance, it follows that the appellee's purported appointment as a full-time patrolman by city council was void *ab initio*. Furthermore, being void *ab initio*, the purported appointment could properly be resisted later by the city's officials making the void appointment, in addition to being subject to a sound challenge by third parties, such as other candidates for the position. The com-

mission and the circuit court applied the concept of estoppel against the city.

■ It is clear, however, that a municipality acting in a governmental, rather than a proprietary, capacity is not subject to the law of equitable estoppel and that, therefore, estoppel cannot be based on unauthorized acts of municipal authorities acting in a governmental capacity. These principles are set forth, for example, in the leading case of *Cawley v. Board of Trustees*, 138 W.Va. 571, 76 S.E.2d 683 (1953).

In *Cawley*, a mandamus proceeding was brought by Mr. Cawley, a fireman, to require the payment of pension benefits for a certain permanent disability which he incurred while he allegedly was a member of the fire department of the City of Beckley, West Virginia. He was 41 years old when he applied for appointment as a member of such fire department, a fact known by city officials. At that time the statute [13] provided that the maximum age for an applicant to take the qualifying examination for appointment as a member of a paid fire department was 35 years of age. This Court affirmed the lower court's sustaining of the respondents' demurrer. We held that "[a] person being older than the maximum age permitted by a civil service law is not eligible for appointment to a municipal fire department. [citation omitted] In making appointments to municipal fire departments, there must be compliance with valid Civil Service provisions. [citation omitted]" 138 W.Va. at 579, 76 S.E.2d at 688. We also rejected the notion of a *de facto* appointment: "Though the relator ... performed the duties of fireman [for over five years], he was not, as a matter of law, a member of the fire department of the City." *Id.* This Court therefore held that the alleged appointment by the then mayor and the subsequent confirmation by council "were ineffective to constitute the relator a member of the fire department of the City. The action of the Mayor and the [City]

---

**12.** The record indicates that all other "full-time" officers are paid on a salaried, not hourly, basis.

**13.** The current version of the statute is *W.Va. Code*, 8–15–17 [1972]. It still provides that the maximum age at the time of application for

appointment to a paid fire department is thirty-five years of age. *W.Va.Code*, 8–14–12 [1972] has an identical provision for appointment to a paid police department.

Council were beyond their powers and therefore ineffective, as being contrary to the plain and clear mandate of the statute granting such power." 138 W.Va. at 579–80, 76 S.E.2d at 688. We noted that the statute in that case, as in the instant case, prohibited appointments " 'in any manner or by any means other than those prescribed in this article.' " 138 W.Va. at 579, 76 S.E.2d at 687.

Finally, this Court rejected the relator's contentions that the city officials had waived their right to object to his over-age status by "appointing" him and that by their "appointing" and "confirming" him and accepting his payments into the pension fund the city officials were estopped to deny his legal appointment and to deny his pension benefits. "Estoppel cannot be based on an unauthorized act of municipal authorities." 138 W.Va. at 581, 76 S.E.2d at 688. "A municipality acting in a governmental capacity is not subject to the law of equitable estoppel. [citation omitted] . . . [I]n organizing, maintaining and paying a municipal fire department, the municipality is acting in a governmental capacity. [citations omitted]" 138 W.Va. at 583–84, 76 S.E.2d at 690.

This Court summarized the reasons for refusing to apply equitable estoppel to municipal governmental functions: "To permit such estoppel on the basis of mistake or ill advised action by a former municipal authority would hinder and hamper governmental functions; and may be contrary to the public interest in many cases." 138 W.Va. at 584, 76 S.E.2d at 690.

Another particularly relevant precedent decided by this Court is *State ex rel. Wells v. City of Charleston*, 92 W.Va. 611, 115 S.E. 576 (1922), syl. pt. 2 to which reads as follows: "[M]unicipal authorities are not estopped by the passage of such an ordinance [one which is void to the extent of its conflict with the statute] from contesting its validity when brought in question in a suit or proceeding by one claiming the benefit thereof and seeking to enforce his supposed right thereunder." Similarly, the council and mayor of the city in the case now before us acted in a manner inconsist-ent with the Police Civil Service Act, the paramount law, and are not estopped from asserting the invalidity of the appellee's void "appointment."

In the very recent case of *W.Va. Public Employees Insurance Board v. Blue Cross Hospital Service Inc.*, 174 W.Va. 605, 328 S.E.2d 356 (1985), we held in syllabus point 1:

A state or one of its political subdivisions is not bound by the legally unauthorized acts of its officers and all persons must take note of the legal limitations upon their power and authority. *Cunningham v. County Court of Wood County*, 148 W.Va. 303, 310, 134 S.E.2d 725, 729 (1964).

The Supreme Court of the United States has also recently addressed the issue of equitable estoppel against the government. For example, in *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), the court stated:

When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant. [footnote omitted] . . .

. . . .

[T]hose who deal with the government are expected to know the law and may not rely on the conduct of government agents contrary to the law. [footnote omitted]

467 U.S. at 60, 63, 104 S.Ct. at 2224, 2226, 81 L.Ed.2d at 52, 54.

In fairness, we note that the majority in *Heckler v. Community Health Services*, in dicta, refused to adopt a broad rule that the government may never be estopped. The two concurring justices would apply estoppel against the government only in a rather narrow range of circumstances and criticized the majority for leaving the impression of hospitality toward claims of estoppel against the government which the court's opinions do not warrant.

A final authority on this point is *County of York v. King's Villa, Inc.*, 226 Va. 447,

309 S.E.2d 332 (1983), wherein the Supreme Court of Virginia held:

> [W]here a contract executed by an agent of the government is *ultra vires* it is void *ab initio* and of no legal effect; thus no performance by either party thereto can give the unlawful contract validity or serve as the basis of any right of action upon it and the doctrine of estoppel has no application.

226 Va. at 452, 309 S.E.2d at 335.

### E. CROSS–ASSIGNMENT

Finally, the appellee's cross-assignment of error is not well taken. Inasmuch as we have concluded that the appellee was never entitled to the appointment as full-time police officer, that part of the commission's and the circuit court's orders denying the appellee back benefits prior to November 17, 1982, is correct. We do not reach the issue of laches, upon which the commission and the circuit court relied for denial of back benefits prior to November 17, 1982.

### F. CONCLUSION

For the reasons set forth in this opinion, we reverse the commission's and the circuit court's orders insofar as they hold that the appellee was entitled to the status of full-time police patrolman as of the date of hiring, with back benefits as of November 17, 1982.

Reversed.