## CIRCUIT COURT OF WARREN COUNTY

Douglas W. Harold, Jr.

v.

Warren County
Board of Supervisors et al.

March 13, 1996

Case No. (Law) 96-20

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court on March 7, 1996, for hearing on the Petition for a Writ of Mandamus to compel the Board of Supervisors to close on a school loan from the State Literary Fund and proceed with the construction of a new high school, whose construction and funding had been approved by a prior Board of Supervisors.

The parties appeared with their counsel, Edward F. Greco and Clifford A. Athey, Jr., for the Petitioner, and Douglas W. Napier for the Defendants. Upon review of the matter and with the concurrence of the parties, the Court tried the case on its merits as opposed to ruling on the Defendants' demurrer. All the parties' prefiled exhibits were admitted into evidence, the

parties' respective findings of fact were reviewed, additional exhibits were received, the Court heard the argument of counsel, and then retired to consider the case. Upon consideration whereof, the Court has made the following decision to deny the petition for writ of mandamus.

## I. *Findings of Fact*

The following facts were either stipulated or found by the greater weight of the evidence.

The Petitioner, Douglas W. Harold, Jr., is a Warren County resident taxpayer, who has a child attending Warren County High School, and he has filed this Petition for Writ of Mandamus demanding that the Supervisors provide sufficient funding to the School Board to complete the new elementary school and the new high school.

Defendant Warren County Board of Supervisors has five members, and it is the governing body of Warren County, Virginia, which is a political subdivision of the Commonwealth of Virginia. In January 1996, the Board of Supervisors was comprised of four new members, who were elected for the first time in November 1995, and one member of the former board. Defendant Warren County School Board is also a political subdivision of the Commonwealth of Virginia. Like the Board of Supervisors its membership changed as a result of the November 1995 elections.

On January 26, 1995, the School Board passed a resolution stating that there was a need for school facilities in Warren County. (Petitioner's Exhibit 1.) On February 2, 1995, the Superintendent of Schools for Warren County provided an estimate to the School Board that the costs of a new elementary school and a new high school would be approximately $34,000,000.00. (School Board Minutes, 95-223.) By resolution dated February 2, 1995, the School Board requested that the Board of Supervisors contract a debt and issue school bonds in the amount of twenty four million dollars pursuant to Virginia Code § 15.1-227.41 to finance the school projects. (Petitioner's Exhibit 2.)

On February 7, 1995, the county administrator informed the Board of Supervisors of the School Board's resolution requesting a school bond issue of twenty four million dollars, which was a portion of the total projected cost of thirty four million dollars for the new elementary school and new high school. He also advised the Board of Supervisors that $5,000,000.00 for each school would be available from the Literary Fund. (Petitioner's Exhibit 3.) The Board of Supervisors authorized the county administrator to submit an application to the Virginia Public School Au-

thority ("School Authority") in order to sell the bonds. (Petitioner's Exhibit 3.)

On April 27, 1995, the School Board authorized the school superintendent to submit the Literary Fund loan applications to the Board of Supervisors for approval of the application and the authority to borrow the funds for the two projects. (School Board Minutes, 95-340.) By resolution dated May 16, 1995, the Board of Supervisors approved the applications for two separate five million dollar Literary Fund loans for the new two schools (Petitioner's Exhibit 5), and it is the withdrawal of those applications and the termination of the contract for the new high school, about which the Petitioner complains.

By resolution dated October 12, 1995, the School Board resolved to make expenditures from its capital account, not to exceed ten million dollars, which was the amount of the Literary Fund loan, and to reimburse itself from the Literary Fund loan proceeds. (Petitioner's Exhibit 7.) On October 12, 1995, the School Board also voted to request from the Board of Supervisors a $23,620,000.00 appropriation to the school construction fund. (School Board Minutes, 96-99.)

By resolution dated October 17, 1995, the Board of Supervisors resolved its intent to make expenditures for certain school projects, including a new elementary school and a new high school, and its intent to reimburse itself from the Literary Fund loan proceeds. In addition, the Board of Supervisors approved the request for the $23,620,000.00 appropriation required to fund the remainder of the construction of the two schools. (Defendants' Exhibit 10.)

On December 28, 1995, the superintendent of schools informed the School Board of the bids for construction of the new high school, and that the low bid was $19,455,200.00 from Howard Shockey and Sons. The School Board voted to accept Shockey's bid, and authorized its Chairman to sign the construction contract for the new high school with Shockey. (School Board Minutes, 96-185.)

The construction contract for the new high school ("Contract") (Defendant's Exhibit 12) was entered into December 28, 1995, between Shockey and the School Board. Neither the County, the Board of Supervisors, nor any of its individual members, were parties to the Contract. The Contract contained a contingency clause, which stated in pertinent part:

> the Warren County School Board represents and agrees that financial arrangements have been undertaken in good faith, to fulfill the Owner's [the School Board's] obligations under the

Contract, through the pending Literary Fund loan applications to the Virginia Board of Education, previously authorized and approved by the Warren County Board of Supervisors and the Warren County School Board, and through other means of funding available to them. The Warren County School Board shall take all actions necessary to continue to prosecute the loan application to the Literary Fund, and obtain and consummate such loans without delay. This contract and the obligations of the Owner are contingent upon sufficient funding. Sufficient funding for the contract shall be deemed to exist if one or more of the currently-pending Literary Fund loan applications, as necessary to complete the funding of the Contract in conjunction with other available sources of funding, are approved and loan funding released by the Virginia State Board of Education at any time before or during calendar year 1997; provided, however, this is not the only means by which sufficient funds may exist.

Article 8 of the contract permits the School Board to terminate the Contract pursuant to the American Institute of Architects General Conditions, which are part of the Contract.

When the Contract was entered into, the Virginia State Board of Education had not approved the Literary Fund loans. On January 16, 1996, the Board of Supervisors voted to withdraw their approval of the Literary Loan applications. (Petitioner's Exhibit 9.) By letter dated January 17, 1996, the county administrator informed the State Department of Education of the Board of Supervisors' withdrawal of approval of the loans and requested that the loan applications be withdrawn before the January 18, 1996, meeting of the Board of Education. Accordingly, the State Board of Education withdrew the loan applications from consideration. The evidence indicates that, had the applications not been withdrawn, the loans would have probably been approved and placed on the top priority list for funding. (Petitioner's Exhibit 11.)

On January 25, 1996, the School Board voted to inform the Contractor of its intention to terminate the Contract because of the Board of Supervisors' withdrawal of its approval of the Literary Fund loan applications. (Defendants' Exhibit 15.) The School Board is in the process of negotiating the termination of the Contract for the construction of the new high school.

To date, the School Board has spent at least between 1.1 and 2 million dollars on the new high school project, which has been spent primarily on

the architect's fee for the design and plans and for site work. (Petitioner's Exhibit 12.)

The School Board and the Board of Supervisors are proceeding with the construction of the new elementary school, whose original contract price was 7.122 million dollars.

The Board of Supervisors currently funds the County's public schools with local funds at a level above that required by the State Standards of Quality.

## II. *Conclusions of Law*

Since the Revolutionary War, education has been recognized in Virginia to be one of the cornerstones of democracy. Section 15 of the Virginia Bill of Rights provides:

> That free government rests, as does all progress, upon the broadest possible diffusion of knowledge, and that the Commonwealth should avail itself of those talents which nature has sown so liberally among its people by assuring the opportunity for their fullest development by an effective system of education throughout the Commonwealth.

In Virginia public education is deemed to be so critical to the viability of democracy that a statewide system of free, public education is now constitutionally mandated. The Virginia Constitution, Article VIII, § 1, provides:

> The General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained.

"The constitutional scheme with respect to educational matters in Virginia contemplates the role of the General Assembly as formulating policies which will maintain an efficient, high quality, statewide educational system. The local school boards, on the other hand, have full responsibility for the application of statewide and local policies, rules, and regulations adopted for the day-to-day management of the public schools." *Dennis v. County School Bd.*, 582 F. Supp. 536 (W.D. Va. 1984). *See generally* "In Aid of Public Education: An Analysis of the Education Article of the Virginia Constitution of 1971," 5 U. Rich. L. Rev. 263 (1971).

The School Board and the Board of Supervisors are separate and distinct governmental agencies of the State. *Board of Supervisors of Chesterfield County v. County School Board of Chesterfield County*, 182 Va. 266, 28 S.E.2d 698 (1944). Although the School Board depends on the Board of Supervisors for a significant part of its funding, the School Board is a separate "public quasi corporation . . . that exercise[s] limited powers and functions of a public nature granted to them expressly or by necessary implication [of law], and none other." *Kellam v. School Board*, 202 Va. 252, 254, 117 S.E.2d 96 (1960). The statutory scheme prescribed by the General Assembly envisions a symbiotic relationship between the school board and the county, whereby the school board manages and maintains the school system, and the county provides the requisite local funding. Virginia Code § 22.1-79.3 empowers the school board to "care for, manage, and control the property of the school division and provide for the erecting, furnishing, and equipping of necessary school buildings and appurtenances and maintenance thereof." However, the school board has no power to tax or otherwise independently fund its operations, and the school board must "manage and control the funds made available to the school board for public schools [from the sources enumerated in § 22.1-88, which include federal, state, and local funds] . . . ." Virginia Code § 22.1-89. "[T]he board of supervisors has the right, within the limits prescribed by law, in their discretion, to fix the amount of money to be raised by local taxation for school purposes at whatever amount they see fit, but they are concerned only with the total amount of tax to be levied, and not with the individual items of the school budget, except in so far as it helps them to determine the total amount of the tax to be levied. After the board of supervisors has appropriated money for schools, the exclusive right to determine how this money shall be spent is in the discretion of the school board, so long as they stay within the limits set up in the budget." *Board of Supervisors of Chesterfield v. County School Board of Chesterfield County*, 182 Va. 266, 280-281, 28 S.E.2d 698 (1944).

The Board of Supervisors is required to contribute only such local funds as are necessary for that county's public schools to meet the Standards of Quality promulgated by the State Board of Education. Virginia Code § 22.1-253.13:1, *et seq.* Reports of Attorney General, 1980-1981, 79, 82; 1974-1975, 359, 360. The Board of Supervisors has the discretion to decide, in its legislative capacity, whether to fund the county's public schools above that level required by the Standards of Quality. Report of Attorney General, 1975-1976, 8, 9.

The authority of the Board of Supervisors to maintain and exercise ongoing fiscal responsibility and supervision over the public school spending is a necessary and inherent power under the statutory scheme. *See Scott County School Board v. Scott County Board of Supervisors*, 169 Va. 213, 193 S.E. 52 (1937). Virginia Code § 22.1-91 provides that "no School Board may expend or contract to expend, in any fiscal year, any sum of money in excess of the funds available for school purposes for that fiscal year without the consent of the governing body appropriating funds to the School Board." The Board of Supervisors must approve the school budget on an annual basis. School Board budgets may be amended by the Board of Supervisors even after adoption, because "[c]hanges in budgetary planning are . . . inevitable," and "the power to amend the budget is both reasonably necessary to effectuate and incidental to the express power to adopt the budget." Report of Attorney General, 1981-1982, 109, 110. "It is important that contracts that are made in reliance on such appropriations are drafted in such a manner that minimizes exposure of the local government to honor these contractual commitments." Report of Attorney General, 1990-1991, 151, 152. Report of Attorney General, 1980-1981, 312, 313. "The Code of Virginia 'withholds from the School Board the power to enter into continuing contracts for any financial obligation beyond the period for which funds have been made available'." Report of Attorney General, 1982-1983, 441.

Loans from the Literary Fund by the School Board require the consent of the Board of Supervisors. Constitution of Virginia, Article VIII, Section 10(b). Public Finance Act of 1991 (Virginia Code §§ 15.1-227.1, *et seq.*), especially § 15.1-227.3, definition of "Bonds," "Project," and, "Unit;" § 15.1-227.7.2; and § 15.1-227.39. The State Board of Education requires that the governing body of the County approve the application for the loan. Report of Attorney General, 1977-1978, 236. Virginia Code § 22.1-153. The Literary Fund loan applications filed in this case were furnished by the State Board of Education and expressly require the approval of the Board of Supervisors. (Petitioner's Exhibits 6 and 6A.) There is nothing in the Code of Virginia, or the common law, that prevents the Board of Supervisors from withdrawing its consent to a Literary Fund loan before the loan has been approved by the State Board of Education. "For this Court to place any limitation on the clear and comprehensive language of the statute, or to create an exception where none exists under the guise of statutory construction, would be to defeat the purpose of the enactment and to engage in judicial legislation." *Town of Crewe v. Marler*, 228 Va.

109, 114, 319 S.E.2d 748 (1984). The resolution of the Board of Supervisors in 1995, consenting to the borrowing of money by the School Board, does not bar the Board of Supervisors from withdrawing that consent in 1996, where the withdrawal of consent was made before the loan was approved by the State Board of Education and before the money was appropriated by the State Board of Education to the School Board. A local governing body does not have the power to bind its successors by agreement, in the absence of statutory authority, where such an agreement would impair the governmental powers of the successor governing body. Report of Attorney General, 1989-1990, 132, 134.

As a general rule, a governmental unit has the right to reconsider its actions and rescind an ordinance or measure that has previously been adopted at any time before the rights of third parties have vested. 56 Am. Jur. 2d, *Municipal Corporations, etc.*, § 352. The Contract allows for termination, and its termination is an issue between the School Board and the contractor, neither of whom are parties to this action. The general law of contracts applies to a contract to which a governmental unit is a party. *Southampton Apartments v. Elizabeth City County*, 185 Va. 67, 37 S.E.2d 841 (1946). Virginia Code § 15.1-227.62 also specifically provides that bonds issued under the Public Finance Act "shall not be dependent upon or affected in any way by proceedings taken, contracts made, or acts performed or done in connection with, or in furtherance of, the project undertaken by the unit [of government] authorizing and issuing the bonds."

While the responsibility for public education is primarily a state concern, like all state action, it must be exercised consistently with the general law and with federal and constitutional requirements. *Allen v. Prince Edward County Sch. Bd.*, 207 F. Supp. 349 (E.D. Va. 1962). "[E]very citizen of the United States, by virtue of his citizenship, is bound to respect this constitutional right [to equality of opportunity to public education], and all officers of the State, more especially those who have taken an oath to uphold the Constitution of the United States, including the Governor, the members of the state legislature, judges of the state courts, and members of the local school boards, are under constitutional mandate to take affirmative action to accord the benefit of this right to all those within their jurisdiction [cites omitted]." *Allen v. Prince Edward County Sch. Bd.*, 207 F. Supp. 349, 353 (E.D. Va. 1962).

While the state prescribes the general educational policies, "the power to operate, maintain and supervise public schools in Virginia is, and has

always been, within the exclusive jurisdiction of the local school boards . . . ." *Bradley v. Richmond School Board*, 462 F.2d 1058, 1067 (4th Cir. 1972). The determination of what sums, should be expended for the support of public schools and their construction is a matter to be determined by the Board of Supervisors. *See Griffin v. Board of Supervisors*, 203 Va. 321, 327, 124 S.E.2d 227 (1962). So long as the schools are not closed or maintained or administered in such a manner as to infringe upon the constitutional rights of citizens or to contravene the law, the Courts will not interfere with the discretionary decisions of the Board of Supervisors and the School Board with respect to the construction of new facilities and other logistical decisions. While public education is constitutionally mandated in Virginia, and while it may be one of the most important functions of a local government, the manner in which that education is provided, the quality of the education, and the physical facilities in which it is provided is in large measure still a matter of local choice subject to the mandates prescribed by the General Assembly of Virginia. The quality of a local school system reflects the commitment of local officials to providing a quality public education to the students within their jurisdiction. Some jurisdictions may opt for a premium educational system, while others may opt for simply providing the minimum prescribed by law, and those are legislative decisions to be made by the local Board of Supervisors and the School Board. "[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976). *Accord United States v. Commonwealth of Virginia ("VMI II")*, 44 F.3d 1229, 1236 (4th Cir. 1995).

"Mandamus is an extraordinary remedy which may be used to compel a public official to perform a purely ministerial duty that is imposed upon the official by law." *Front Royal v. Front Royal and Warren County Ind. Park Corp.*, 248 Va. 581, 584, 449 S.E.2d 794 (1994). "Mandamus does not lie to compel the performance of a discretionary act." *Cooper v. Haas*, 210 Va. 279, 281, 170 S.E.2d 5, 7 (1969). The instances in which the courts in Virginia have usually involved themselves in mandamus proceedings against local governing bodies to construct public facilities is in the instance of court facilities, *see, e.g. Manly Manufacturing Co. v. Broaddus*, 94 Va. 547 (1897), and that right is expressly recognized by statute. Virginia Code § 15.1-267. Discretionary matters dealing with school construction are generally left to the school authorities and are not

decided by the courts by mandamus. *See* 52 Am. Jur. 2d, *Mandamus,* § 234. In *Scott County School Board v. Scott County Board of Supervisors,* 169 Va. 213, 193 S.E. 52 (1937), a mandamus proceeding was brought by the school board against the board of supervisors to compel the board of supervisors to impose a levy sufficient to produce the money requested by the school board in their budget submitted to the supervisors. The school board contended that the board of supervisors had no right to increase or reduce the amount requested in the school budget. The board of supervisors had reduced the amount it had appropriated for schools $23,000.00 below the amount requested by the school board by reducing and eliminating some items, but the Supreme Court held that the board of supervisors, within the limits fixed by law, had discretion as to the amount of money it would raise for school purposes, and the petition for mandamus was denied.

The Petitioner concedes that the initial decisions as to whether to build the new high school and how to fund it were discretionary decisions of the School Board and Board of Supervisors, but the Petitioner argues that the high school project has evolved to the point that the Board of Supervisors could not withdraw their support of the Literary Fund Loans. The Petitioner argues that the Board of Supervisors had exhausted their discretion and that only ministerial acts remained to be exercised by the Board of Supervisors insofar as the high school project was concerned, relying upon 52 Am. Jur. 2d, *Mandamus,* § 84, and the general statutes governing the loans from the literary fund. However, as previously noted, there is no statutory prohibition upon the Board of Supervisors' withdrawal of its consent to the Literary Fund loans prior to the loans being approved and funded, and the Board of Supervisors had the discretion to withdraw their approval of the loans when they did. While the Petitioner may question the prudence of the Board of Supervisors' actions and may challenge them politically, they are not the proper basis for a writ of mandamus.

### III. *Decision*

For the foregoing reasons, it is adjudged and ordered that the Petition for a Writ of Mandamus is denied.