Present: All the Justices

KING GEORGE COUNTY SERVICE
AUTHORITY

v.  Record No. 030592  OPINION BY JUSTICE CYNTHIA D. KINSER
                                                March 5, 2004
PRESIDENTIAL SERVICE COMPANY
TIER II, INC.

        FROM THE CIRCUIT COURT OF KING GEORGE COUNTY
              Horace A. Revercomb, III, Judge


     The dispositive issue in this appeal is whether

alleged contracts for the purchase of a privately owned

utility system by a county service authority can be

specifically enforced in the absence of a resolution by the

service authority's board authorizing or ratifying the

contracts.  Concluding that such a resolution is necessary,

we will reverse that portion of the circuit court's final

decree specifically enforcing one of the alleged contracts

and directing the service authority to purchase a certain

portion of the utility system.

                MATERIAL FACTS AND PROCEEDINGS

     The appellant, King George County Service Authority

("Service Authority"), was created in 1992 pursuant to the

provisions of the Virginia Water and Waste Authorities Act,

Code § 15.2-5100, et seq.  The Service Authority is a

"public body politic and corporate."  Code § 15.2-5102(A);

see also Short Pump Town Ctr. Cmty. Dev. Auth. v. Hahn, 262

Va. 733, 742, 554 S.E.2d 441, 445 (2001). Its initial purpose was to acquire existing, privately owned water and sewer systems in King George County.

The appellee, Presidential Service Company Tier II, Inc. ("Presidential"), owned a small water system that served some residences located in Section 14 of Presidential Lakes Subdivision ("Section 14"), which is situated in King George County. This 354-lot residential development was designed to have individual septic tanks on each lot and one drilled well to supply potable water. As of 1993, only 33 homes had been allowed to connect to the water supply on account of certain health regulations, and individual septic tanks had been difficult to permit because of soil conditions.

Due to a need for affordable housing in King George County that would be served by a central water and sewer system, the general manager of the Service Authority wrote Presidential in June 1993 and advised that

> it is the intention of the King George County Service Authority to take over ownership and operation of all private utility systems in the County. This policy is in keeping with the adopted Comprehensive Plan which calls for a central sewer and water system owned and operated by the County . . . .

> As part of that effort, the systems owned by Presidential Services Corporation Tier [II] are intended for acquisition.

Accordingly, in July 1993, the Service Authority's board authorized the general manager to seek funding for the purpose of purchasing the existing water system owned by Presidential, improving and expanding that water system, and constructing a central sewer system for Section 14. The Service Authority then prepared a letter agreement, dated September 2, 1993, in which it offered to purchase the existing water system owned by Presidential for the sum of $280,000. The offer provided that the price would be "held firm until January 31, 1994 and if closing [was] delayed beyond that date, the price [would] escalate at the rate of 1/2 of one percent per month." However, the Service Authority's "obligation to purchase the system [was] subject to [its] ability to obtain financing by not later than April 1, 1994. The Service Authority's general manager signed the letter agreement on behalf of the Service Authority, and Presidential accepted the offer as evidenced by the signature of its president on the document.[1]

---

[1] The letter agreement also stated that, upon Presidential's acceptance of the offer, a more definitive agreement would be prepared. The parties never executed such an agreement although the Service Authority prepared one and sent it to Presidential.

On March 15, 1994, the Service Authority's board ratified the letter agreement entered into by the Service Authority and Presidential for the purchase of the existing water system. The board's resolution stated that the agreement would expire on March 31, 1994, because the Service Authority's obligation to purchase the existing water system was subject to its ability to obtain financing no later than April 1, 1994. In light of that fact, the Service Authority's board, in its resolution, ratified and confirmed the agreement for the purchase of the existing water system, and authorized the Service Authority's general manager to secure short-term financing in order to proceed with that acquisition.[2]

During the ensuing weeks, representatives of both parties discussed an alternative approach for providing a central water and sewer system for Section 14. A letter dated April 21, 1994, from Presidential to the general manager of the Service Authority confirmed that Presidential would construct an expanded water system, a sewer collection system, and a treatment plant, and that the Service Authority would then purchase the completed system from Presidential instead of the Service Authority

_____

[2] The resolution also authorized the general manager to obtain short-term financing for other acquisitions as well

undertaking the construction.  The letter also specified that, if the Service Authority could not obtain financing through a particular government agency, then it would complete the acquisition with bond financing.

Presidential subsequently prepared a "Cost [S]ummary of Presidential Lakes Section 14 Sewer & Water System," detailing the estimated costs of each component of the central water and sewer system, including acquisition of the existing water system.  The estimated costs, which included a ten percent administrative fee, totaled $1,616,146 before debt service.  A subsequent memorandum dated November 29, 1994, also prepared by Presidential, confirmed the purchase of the existing water system for the sum of $280,000 plus interest at 6 percent from January 31, 1994.  The memorandum further provided that the Service Authority would reimburse Presidential for "all engineering, administrative, interest, construction and any other costs for expansions" of the existing water system. However, according to the terms of the memorandum, the sewer system would be constructed by Presidential and sold

---

as development of a sewer system for Section 14.

to the Service Authority "at a cost of reimbursement of cost to produce."[3]

In a letter dated December 1, 1994, the general manager of the Service Authority advised a financial institution, which was financing the construction work by Presidential, that the Service Authority's application for funds from a particular government agency had been approved and that the purchase of both the expanded water system and the sewer system was included in the Service Authority's project list.  However, on its December 1997 project list, the Service Authority showed no funds designated for acquisition of the Section 14 water and sewer system.  The Service Authority admitted that, in 1999, it advised Presidential that the Service Authority took the position that it had no binding obligation to purchase the water and sewer system in Section 14.[4]

This litigation then ensued.  In an amended bill of complaint, Presidential sought specific performance of the alleged agreements for purchase of the existing water

_____

[3] Presidential asserted that the November 29, 1994 memorandum memorialized its oral agreement with the Service Authority regarding expansion of the existing water system and construction of the sewer system.

[4] Presidential received authorization from the Commonwealth of Virginia Department of Health, in May 1996,

system, the expanded water system, and the sewer system for Section 14. The circuit court referred the matter to a commissioner in chancery. Based on evidence presented, the commissioner in chancery found, in an initial report, that there was "a meeting of the minds" and that "[t]he terms of the contract were sufficiently certain and complete, and that negotiations had been concluded such that the [Service] Authority would purchase both the water and the sewer systems as finally constructed by [Presidential] per plans adopted by the [Service] Authority's engineers at its costs, including a ten (10) percent administrative fee." The commissioner in chancery concluded that specific performance was warranted and that Presidential's claim was not barred by the statute of frauds. The circuit court overruled both parties' objections to the commissioner's report and referred the matter back to the commissioner in chancery to determine the amount owed by the Service Authority to Presidential.

In a supplemental report, the commissioner in chancery found that the purchase price of the existing water system was "a flat $280,000.00 with interest at 6% beginning on February 1, 1994." The commissioner in chancery concluded

---

to operate the sewer system in Section 14 and, in February 2000, to place the water system in Section 14 in service.

that the purchase price of the expanded water system and the sewer system was $1,604,380.91, which included a 10 percent administrative fee.  Finally, the commissioner in chancery found that Presidential was entitled to prejudgment interest on the purchase price of the expanded water system and the sewer system.

After considering the parties' exceptions to the supplemental report filed by the commissioner in chancery, the circuit court held, in a final decree, that Presidential was "entitled to specific performance of the . . . agreement to convey the central water and sewer system for Section 14 of Presidential Lakes Subdivision to the [Service Authority] for the purchase price of $280,000.00 for the preexisting water system, which price increases at the rate of 6% per year from February 1, 1994, until paid, and for the purchase price of $1,604,380.91 for the expansion of the water system and the construction of the sewer system."  However, the circuit court agreed with the Service Authority's position that Code § 15.2-1244 bars Presidential's recovery of any prejudgment interest on the $1,604,380.91 purchase price.  The Service Authority

appeals from the circuit court's final decree, and

Presidential assigns cross-error.[5]

ANALYSIS

Although the Service Authority raises several issues on appeal, we need to address only one.  The dispositive question is whether the Service Authority's board adopted a resolution authorizing or ratifying either of the alleged agreements with Presidential, and if not, whether the agreements can be specifically enforced in the absence of such a resolution.

In County of York v. King's Villa, Inc., 226 Va. 447, 449, 309 S.E.2d 332, 333 (1983), this Court addressed whether a county administrator had contractually "attempted to lock [a] connection fee in place and by that attempt [had] intruded into an area exclusively reserved for" a county board of supervisors.  We held that the power to fix or change such fees rested solely with the board of supervisors and that the county administrator never had the authority to fix rates and fees.  Id. at 450, 309 S.E.2d at 333-34.  Thus, the only way in which the connection fee could have been locked into place indefinitely was through some express action by the board of supervisors, such as

_____

[5] We also awarded a separate appeal to Presidential. Presidential Serv. Co. Tier II, Inc. v. King George County

9

adopting a resolution to that effect or ratifying the portion of the contract concerning the connection fee. Id., 309 S.E.2d at 333.

King's Villa, Inc., the other party to the contract signed by the county administrator purportedly on behalf of the county, had "dealt in good faith with a public servant who exceeded the bounds of his authority." Id., 309 S.E.2d at 334. We reiterated "that those who deal with public officials must, at their peril, take cognizance of their power and its limits." Id. (citing Richard L. Deal & Assocs., Inc. v. Commonwealth, 224 Va. 618, 623, 299 S.E.2d 346, 349 (1983); South Hampton Apartments, Inc. v. Elizabeth City County, 185 Va. 67, 78-79, 37 S.E.2d 841, 846 (1946)). Finally, we explained that "where a contract executed by an agent of the government is ultra vires it is void ab initio and of no legal effect; thus no performance by either party thereto can give the unlawful contract validity or serve as the basis of any right of action upon it . . . ." Id. at 452, 309 S.E.2d at 335.

Similarly, in American-LaFrance & Foamite Indus., Inc. v. Arlington County, 169 Va. 1, 192 S.E. 758 (1937), we explained that a court will not enforce a contract that is invalid:

Serv. Auth., Record No. 030593 (August 7, 2003).

10

> If the contract is . . . invalid, or is based upon a transaction involving no moral turpitude, and is simply contrary to some legal provision relating to the manner, method, or terms of its performance, with no penalty provided other than its invalidity, the court will not require performance of either the express contract or a contract by implication.

Id. at 9, 192 S.E. at 761.

As we stated earlier, the Service Authority is, by statute, a "public body politic and corporate."  Code § 15.2-5102(A).  The powers of the Service Authority are exercised by a board, Code § 15.2-5113(A), and the vote of a majority of the board's members is necessary for any action taken by the Service Authority, Code § 15.2-5113(B).  Thus, employees of the Service Authority, such as the general manager, can enter into contracts on behalf of the Service Authority only when authorized to do so by a majority vote of its board members.  See King's Villa, 226 Va. at 450, 309 S.E.2d at 333; see also County of Campbell v. Howard, 133 Va. 19, 59, 112 S.E. 876, 888 (1922) (holding that a board of supervisors could obligate a county "only at authorized meetings duly held, and as a corporate body, by resolution duly adopted; and not by the action of its members separately and individually").

The record in this case is replete with evidence regarding the negotiations between the general manager of the Service Authority and Presidential about the terms of

11

the alleged agreements and confirming the provision of engineering services to the Service Authority not only with regard to the plans for constructing the expanded water system and the sewer system but also as to monitoring the construction by Presidential. However, the record does not contain a resolution by the Service Authority's board authorizing or ratifying either the purchase of the expanded water system and sewer system or the terms of the alleged contract between the Service Authority and Presidential for the purchase of those particular facilities. Nor is there a resolution authorizing the general manager to enter into a contract with Presidential on behalf of the Service Authority to purchase the Section 14 expanded water system and sewer system.[6] The provisions of Code § 15.2-5113(B), however, specifically require that "the vote of a majority of board members shall be necessary for any action taken by the authority." Subsection E of that statute authorizes the board members to appoint a chief administrative or executive officer but requires such

---

[6] The general manager of the Service Authority during the period from 1989 until the end of 1994 testified that the Service Authority's board had "to take formal action" before any contract could be signed and that he never presented any formal proposal to the board for the purchase of the "to be constructed . . . Section 14 sewer and water system."

person to "enforce the orders and resolutions adopted by the board members and perform such duties as may be delegated to him by the board members."

Thus, we conclude that the alleged contract between the Service Authority and Presidential is unlawful for lack of a resolution by the Service Authority's board. King's Villa, 226 Va. at 450, 309 S.E.2d at 333. For that reason, we will not require performance of the alleged oral contract. See id. at 452, 309 S.E.2d at 335; American-LaFrance, 169 Va. at 9, 192 S.E. at 761. The general manager could not bind the Service Authority or enter into a contract on its behalf in the absence of such a resolution. Anyone dealing with an officer or employee of a public body must ascertain the extent and nature of that person's authority. South Hampton Apartments, 185 Va. at 78-79, 37 S.E.2d at 846. Therefore, we hold that the circuit court erred in entering a final decree directing the Service Authority to purchase the newly constructed sewer system and expanded water system from Presidential for the sum of $1,604,380.91.

However, the Service Authority's board, by resolution on March 15, 1994, ratified the September 2, 1993, letter agreement entered into by the Service Authority's general manager and Presidential for the purchase of the existing

13

water system located in Section 14.  That agreement is not

unlawful for lack of a resolution by the Service

Authority's board.  Thus, we conclude that the circuit

court did not err in specifically enforcing the letter

agreement and directing the Service Authority to purchase

the existing water system from Presidential for the sum of

$280,000, increasing at the rate of 6% per year from

February 1, 1994, until paid.[7]

### CONCLUSION

For these reasons, we will affirm that portion of the

circuit court's final decree pertaining to the purchase of

the existing water system.  We will reverse that portion of

---

[7] We find no merit in the assertion by the Service Authority that the circuit court's final decree directing purchase of the existing water system violated the "law of the case" doctrine.  The Service Authority contends that the commissioner in chancery, in the initial report, found that the parties had agreed that the Service Authority would purchase all the utility systems for costs plus a ten percent administrative fee.  We do not agree with that interpretation.  Nevertheless, even if the Service Authority is correct, the circuit court was free to modify its ratification of the initial report upon receiving the supplemental report in which the commissioner in chancery set out a separate sum for purchase of the existing water system.  The decree ratifying the initial report was not a final decree.  See Rule 1:1.  Thus, any purported relitigation of the purchase price of the existing water system was not foreclosed as claimed by the Service Authority.

14

the circuit court's final decree concerning the purchase of

the expanded water system and sewer system.[8]

<u>Affirmed in part</u>,
<u>reversed in part</u>,
<u>and final judgment</u>.

---

[8] Presidential assigns cross-error to the circuit court's final decree.  In one of the cross-errors, Presidential challenges the circuit court's ruling that Code § 15.2-1244 barred an award of interest on the purchase price of the expanded water system and sewer system.  That issue is also the subject of the separate appeal awarded to Presidential, see footnote five <u>supra</u>, and will not be addressed in this opinion.  In its other assignment of cross-error, Presidential asserts that the circuit court erred by permitting the Service Authority to raise defenses that were not disclosed as ordered by the court.  Although Presidential does not clearly identify on brief what defenses the Service Authority supposedly failed to disclose, we find no merit in this claim.