# CIRCUIT COURT OF THE CITY OF RICHMOND

Landfall Consulting, L.L.C.

v.

Virginia State
University *et al.*

February 10, 2015

Case No. CL13-2685

BY JUDGE GREGORY L. RUPE

This matter was brought before the Court on December 18, 2014, on motions for summary judgment filed by Plaintiff, Landfall Consulting, L.L.C. ("Landfall," or "Plaintiff") and Defendants Virginia State University ("VSU"), The Visitors of Virginia State University, a/k/a The Board of Visitors of Virginia State University, and David A. Von Moll, Comptroller of Virginia (collectively, "VSU Defendants"). The Court, having reviewed the memoranda, called for counsel to present oral argument. The Court took the matter under advisement pending the issuance of this letter opinion.

Upon due consideration of the law and facts, the Court finds that summary judgment is appropriate; no trial is needed because no further evidence may be offered that could affect the results. For the reasons that follow, the Court hereby grants summary judgment to Landfall on the breach of contract claim. The Court further denies summary judgment and dismisses the account stated claim and denies the summary judgment motions of the VSU Defendants.

■■■■■■■■
■■■■■

*Factual Background*

The facts are virtually undisputed and amply supported by the record. The conduct underlying this action began in March 2012, when James Tyson, the Vice President of Institutional Advancement at Virginia State University, and Richard Lundvall, the managing member of Landfall, began conversations about a marketing project at Virginia State University. In reality, it seems clear that Mr. Lundvall *is* Landfall Consulting, L.L.C., so at times in this letter their names may be used interchangeably.

Mr. Lundvall is a marketing expert similar in job description to the main characters in the somewhat popular TV series "Madmen." We could refer to Mr. Lundvall and his consulting business as the "Ad Man." Mr. James B. Tyson, as the Vice President of Institutional Advancement for VSU, could be better described as simply the "Marketing VP."

In brief, Lundvall was asked by the Martin Agency if he would assist VSU with marketing efforts. Following the initial contact by the Martin Agency, Tyson contacted Lundvall. Tyson and Lundvall started down a course of dealing, including meetings, phone calls, and a volume of emails. At some point in this series of dealings, both Tyson and Lundvall had what they both thought was a valid and binding contact for marketing services. During this series of dealing, Lundvall quite unwisely never obtained a signed, written contract. Lundvall also unwisely never definitively determined whether Tyson, the Marketing VP for VSU, did in fact have legal authority to bind VSU to a marketing contract. In another unwise move, Lundvall failed to seek legal counsel or otherwise determine whether the contract was subject to the Virginia Public Procurement Act (hereinafter the "Act" or "VPPA"). It is clear from the pleadings that Tyson overstepped his authority such that one wonders about his "tenure" at the University. This is the essence of the facts of this dispute, but it is helpful to go over in some detail the course of dealing just summarized.

In a series of meetings and emails throughout the Spring of 2012, Lundvall entered into an agreement with Tyson to provide marketing services to VSU. Tyson told Lundvall that he was "thrilled to have the opportunity to have you assist us in accomplishing our goal of increasing the effectiveness and reach of VSU through efficient and creative marketing strategies" and "I look forward to working with you to take the next steps in helping bring all of this to fruition." Pl.'s Mem. Supp. Mot. Summ. J. Ex. 1. After discussing with Lundvall the types of services Landfall could provide, Tyson made the Institutional Advancement team at VSU aware of Lundvall through an "electronic email introduction," so to speak. Pl.'s Mem. Supp. Mot. Summ. J. Exs. 1-2. Lundvall and Tyson exchanged email correspondence regarding pricing, timeline, and scope of the project. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 3–5.

This correspondence was specific in the services to be rendered and the costs to be charged. On April 23, 2012, Lundvall stated "my day rate is

typically $2,000 per day and an hourly rate of $300 per hour. As it stands, I have about 2.5 days against the project thus far but I would prefer to put this time against 'due diligence' rather than bill for it." Pl.'s Mem. Supp. Mot. Summ. J. Ex. 4. Lundvall sent Tyson an "initial timeline/work plan" on April 25, 2012, and they corresponded throughout the two months to establish precisely what the work plan would be. Pl.'s Mem. Supp. Mot. Summ. J. Exs. 5-8.

During this time, Lundvall *did* consider the public bidding requirements of the VPPA, and, according to the Complaint, "specifically asked Tyson whether a bid or procurement process would be required … for the project Tyson had in mind." Compl. ¶ 10. Lundvall was familiar with the bid and procurement process and had made a business decision when he started Landfall to "avoid projects that required a bid and/or procurement process." Pl.'s Resp. to VSU's First Set of Interrog. 10. When asked directly by Lundvall about a possible bid process in a meeting in late March 2012, Tyson represented that the project at issue would be funded by "development funds" and, therefore, did not fall under state procurement guidelines. *Id.* In responses to interrogatories during this litigation, the VSU Defendants stated that "Tyson was unfamiliar with this type of matter and spoke to various people at VSU to explore a source of funding … [and] later turned out to be incorrect." Def.'s Resp. to Pl.'s Interrog. 3. Further, "no one [at VSU] mentioned to Mr. Tyson that a competitive procurement process was necessary for Lundvall's proposed contract, and Mr. Tyson did not realize that such a process was necessary." *Id.*

In June 2012, Tyson informed Lundvall via email that "we are working to have the contract finalized and ready to start issuing payment on or soon after [July 1, 2012]," the start of VSU's fiscal year. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 9. On July 16, 2012, Landfall submitted a final contract to Tyson by email, which detailed the agreement between the parties and outlined a payment schedule. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 10. Nobody at VSU ever signed this contract. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 19.

Regardless, Landfall began providing the agreed-upon marketing services for VSU. Lundvall worked closely with Tyson and other members of the VSU community and began requesting payment. Pl.'s Mem. Supp. Mot. Summ. J. Exs. 10–12. Lundvall submitted invoices on July 23, 2012, and August 28, 2012. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 13. Some time had passed without VSU issuing payment on the invoices, so Lundvall and Tyson exchanged emails about how to resolve the issue. Tyson told Lundvall that "I am committed to keeping my promise to you and honor [sic] the time you have invested with us and am looking forward to all that we will do together." Pl.'s Mem. Supp. Mot. Summ. J. Ex. 14. Tyson repeatedly assured Lundvall that he would be paid for his services. Despite

still having received no payment, Lundvall submitted a third invoice on October 1, 2012. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 16.

On October 8, 2012, VSU's Purchasing Director, Yolanda Buck, emailed Lundvall and ordered him to stop working until further notice, but informed him that VSU "could" have a check ready by October 23, 2012. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 18. That same day, VSU's Vice President for Administration and Finance, David Meadows, emailed Tyson, copying VSU's President Keith Miller. Meadows referenced the agreement with Landfall and expressed concern that it did not arise from a competitive bidding process. Tyson responded that no contract had actually been signed and expressed his desire that Landfall be paid because "he has provided valuable services." Pl.'s Mem. Supp. Mot. Summ. J. Ex. 19. Meadows remained concerned about the lack of competitive bidding.

On October 12, 2012, VSU's Chief Audit Executive, Joanne Curtis Taylor, wrote an internal memorandum to VSU's President which stated "Mr. Tyson appears to have entered into an oral contract in May 2012 … [with Landfall] … to provide marketing services." Her memorandum showed that the contract had a total value of $114,750.00, with the three above-listed invoices totaling $77,355.00 in value. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 20.

On October 22, 2012, Meadows emailed Lundvall, informing him that the contract was "initiated by an individual without authority to do so; therefore, [it] is void. Virginia State University is not Liable for Payment." Pl.'s Mem. Supp. Mot. Summ. J. Ex. 20 (capitalization in original).

## Procedural History and Issues

The instant action was instituted in the Circuit Court of the City of Richmond on June 14, 2013. Originally, Tyson himself and the VSU Foundation were named defendants. On October 21, 2013, the Parties appeared before the Court on (1) a Special Plea filed on behalf of all defendants; (2) the Board of Visitors' and Comptroller's Motions to Drop; (3) Tyson's Special Pleas; (4) VSU Foundation's Demurrer; and (5) Plaintiff's Motion to Strike the pleas in bar. As a result of that hearing, Tyson and the VSU Foundation were dismissed from the action. Also dismissed were the Plaintiff's Constructive Fraud and Fraud claims against the Defendants.

There are two remaining claims against the three remaining defendants: Breach of Contract and Account Stated. The Court heard oral argument on December 18, 2014, where counsel for Landfall and the VSU Defendants both represented that this matter was ripe for summary adjudication.

There are a number of issues presented for decision in this dispute that will be described below. The respective positions of the litigants are to be considered in depth, but a baseline summary would be helpful to the reader. The VSU Defendants argue that they are protected in this case by sovereign immunity. This sovereign immunity protects the VSU Defendants from any

contract action unless that contract is entered by a government representative with actual authority. The VSU Defendants argue that "apparent authority" has no place in dealings with the government or its entities. Further, the VSU Defendants assert that the University cannot be bound unless the contract is also in compliance with the Act. For his part, Lundvall argues the VSU Defendants can be bound to a contract where the contracting agent has apparent authority. Put another way, who could justly argue that a Marketing VP for a university could not enter a binding contract with a marketing vendor like Lundvall? Plaintiff asserts that the Act does not apply to the facts of this case. Plaintiff further asserts that, if the Act were to be applied to this case, he should at least be compensated for the billings for work performed before the University notified him the alleged contract would not be honored. Finally, Plaintiff asks for attorney's fees.

### Analysis

Summary judgment is appropriate when there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Va. Sup. Ct. R. 3:20. This Rule states that "[i]f it appears from the pleadings ... [or] the admissions, if any, in the proceedings ... that the moving party is entitled to judgment, the court shall enter judgment in that party's favor." *Id.*

Summary judgment is available only in those cases where "no trial is necessary, because no evidence could affect the result." *Fire Assurance Corp. v. Cohen*, 203 Va. 810, 814 (1962). "[I]f the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence, summary judgment is not appropriate." *Fultz v. Delhaize Am. Inc.*, 278 Va. 84, 88 (2009). Denial of a material fact offered by the opposing party is sufficient to avoid summary judgment. *See, e.g., Winslow v. Scaife*, 224 Va. 647, 652 (1983).

### A Decision for the VSU Defendants

This Court, or a court further up the judicial food chain, could easily decide this case in favor of the VSU Defendants. What follows in this section is what a reviewing court *could* have decided, written to demonstrate the merits of the VSU Defendant's position. But it is not the opinion of the Court.

### Breach of Contract

#### A. *Apparent Authority*

Plaintiff's primary argument for finding the existence of a contract, and thus a corresponding breach committed by the VSU Defendants, is the

doctrine of apparent authority as it applies to Tyson. The Court will not address Tyson's actual authority.

The extent of Tyson's actual authority is a disputed material fact, and thus not appropriate for summary judgment. Plaintiff is unwilling to concede that Tyson lacked the express authority to enter this contract. Pl.'s Mem. Supp. Mot. Summ. J. 11. n. 1. Defendant has offered clear documentation to the Court indicating that Tyson did not have authority delegated from any source to enter into this contract. According to VSU's Procurement Manual, "authority to sign contracts for Virginia State University is delegated from the University President to the Vice President for Administration and Finance and the Purchasing Director; each may further delegate that authority as appropriate." Def.'s Mem. Supp. Mot. Summ. J. Ex. 8. There was never any written delegation of this authority to Tyson. The Court thus views Plaintiff's objection on this point to be somewhat disingenuous. Regardless, the Court will address only the apparent authority grounds.

When an agent, acting within the scope of its apparent authority, enters into a contract with a third person, "the principal becomes immediately a contracting party, with both rights and liabilities to the third person." *Equitable Variable Life Ins. Co. v. Wood*, 234 Va. 535, 539 (1987) (*quoting Restatement (Second) of Agency*, § 292 (1957)). Apparent authority will be found if "in view of the character of the agent's actual and known duties, an ordinarily prudent person, having a reasonable knowledge of the usages of the business in which the agent is engaged, would be justified in believing that the agent is authorized to perform the act in question." *Wright v. Shortridge*, 194 Va. 346, 353 (1952). Apparent authority is determined by how the principal "holds out" its agent to a third party, which can occur by virtue of the agent's position alone. *See, e.g., Avery-Craft v. Young Hee Moon Kang*, 77 Va. Cir. 53, 54 (Prince William County, 2008); *Johnson v. Shaffer*, 33 Va. Cir. 57, 72 (Warren County, 1994). Plaintiff avers that Tyson, as a high-ranking member of VSU's management charged with institutional advancement, had the apparent authority to enter into a contract such as the one in question here.

If VSU were a private entity, this may be true. The Court agrees that Tyson's position, Vice President of Institutional Advancement, would lead an ordinarily prudent person to reasonably believe that Tyson was authorized to enter into a contract for the marketing services at issue. However, VSU is not a private entity.

The Supreme Court of Virginia has stated that "those who deal with public officials must, *at their peril*, take cognizance of their power and its limits." *County of York v. King's Villa, Inc.*, 226 Va. 447, 450 (1983) (emphasis added). In *York*, a private company entered into a contract with the County of York, a portion of which purported to set "tap fees" in a sewer system. This portion of the contract was held to be "void and of no effect"

because the County Administrator did not have the authority to set tap fees and bind the County in that way. *Id.* at 449-50.

The *York* Court cautioned:

> [The company] is in the unfortunate position of having dealt in good faith with a public servant who exceeded the bounds of his authority. This is not an uncommon problem nor is it one which engenders goodwill on the part of citizens for governmental officials with whom they must deal. For it is true that, where, as here, a contract was prepared by the County Administrator and approved as to form by the County Attorney, a citizen might easily conclude, without further inquiry or investigation, that every part of the contract was legal and binding and could be relied upon.... .
>
> The rule of caution repeated above is the outgrowth of competing and conflicting demands. On one hand, the law favors contracts and attempts to uphold and enforce them wherever possible. *On the other hand, our system of government is designed to restrain public officials from having unfettered, unchecked control over governmental affairs.* This means that there are limits on the powers of the various levels of government and curbs on the powers entrusted to agents of government. Were we to rule in favor of [the company] we would rend the fabric of government because we would be permitting the judgment of one official to supplant the collective wisdom of the elected governing body whom the people have chosen to wield the power here in dispute.

*Id.* (emphasis added).

The Supreme Court of Virginia outlined this policy regarding contracting with public officials as early as 1929. *City of Bristol v. Dominion Nat. Bank,* 153 Va. 71, 83 (1929) ("[t]hose who deal with public officials must, at their peril, take cognizance of their power and its limits."). Failure to ascertain the actual authority of an official places the parties *in pari delicto. Id.* at 81–82. When the parties are *in pari delicto,* the Court will not assist either; even if one has performed, the law leaves the parties where it finds them. *Id.; see also Richard L. Deal & Assocs. v. Commonwealth,* 224 Va. 618 (1983); *American-LaFrance & Foamite Indus. v. Arlington Cnty.,* 164 Va. 1, 9–10 (1935) (the party chargeable with ascertaining the authority of a public official "is *in pari delicto* with the officers, and should have no remedy ... the protection of public corporations [such as VSU] from such unauthorized acts of their officers and agents is a matter of public policy in which the whole community is concerned").

One might read these cases in conjunction as stating that a public official such as Tyson cannot bind VSU through his apparent authority alone; the

authority of agents of the Commonwealth must be derived from statute or by a delegation authorized by statute. Because "those who deal with public officials must, at their peril, take cognizance of their power and its limits," it necessarily follows that those who deal with public officials may not rely upon the appearance of the official's authority alone. Lundvall was under an obligation to determine Tyson's authority rather than rely on his apparent authority, and, by failing to determine Tyson's authority, he failed to protect his own economic interests.

Finally, *Michie's Jurisprudence* states that "[a]cts of a private agent may bind the principal where they are within the apparent scope of his authority, but this is not so with a public officer, as the state is bound only by authority actually vested in the officer, and his powers are limited and defined by its laws." 1A Mich. Jur., *Agency*, § 9. The Court is well aware that this reference is not controlling authority and the support underlying the quote is West Virginia case law. But this Court, in light of the preceding discussion, believes this statement could be an accurate representation of the law of Virginia as well. Apparent authority simply does not appear to function the same in purported contracts entered into with agents of the Commonwealth as it does in the context of private business entities.

## B. *The Virginia Public Procurement Act*

The parties further disagree on the extent to which the Virginia Public Procurement Act (the "Act" or "VPPA"), Va. Code Ann. § 2.2-4300 *et seq.*, controls the outcome of this matter. The VSU Defendants aver that the purported contract in the instant case is nothing more than an invalid public contract, awarded in violation of the Act and, therefore, void. They argue that to be valid, a "public contract must be awarded in strict accordance with the Act's statutory scheme, which prescribes the mandatory methods that public bodies must use to procure goods and services." Def.'s Mem. Supp. Mot. Summ. J. 9. Plaintiff contends that the VSU Defendants may not hide behind the Act and use it as a shield against liability. Plaintiff argues that VSU's own failure to conduct competitive sealed bidding or competitive negotiation in conformance with the statutory requirements should not be grounds for sliding out from under their obligation to pay for services rendered.

The VSU Defendants argue that the weight of authority establishes that the contract entered into by Tyson was *ultra vires* and void *ab initio* for its failure to comply with the requirements of the Act. A review of the Act's requirements is necessary.

The purpose of the Act is to "enunciate the public policies pertaining to governmental procurement from nongovernmental sources." Va. Code Ann. § 2.2-4300. "[I]t is the intent of the General Assembly that competition be sought to the maximum feasible degree [and] that procurement procedures involve openness and administrative efficiency." *Id*. To that end, it states

that "[*a*]*ll* public contracts with nongovernmental contractors for … the purchase of services … *shall* be awarded after competitive sealed bidding, or competitive negotiation as provided in this section, unless otherwise authorized by law." Va. Code Ann. § 2.2-4303(A) (emphasis added).

"Public contract," in the context of the Act, means "an agreement between a public body and a nongovernmental source that is enforceable in a court of law." Va. Code Ann. § 2.2-4301. "Services" means "any work performed by an independent contractor wherein the service rendered does not consist primarily of acquisition of equipment or materials, or the rental of equipment, materials, and supplies." *Id.*

Accordingly, in order for a services contract between a public body and a nongovernmental source to be enforceable in a court of law, it *must* be awarded after competitive sealed bidding or competitive negotiation, unless otherwise authorized by law. It is undisputed that the contract here was not awarded as a result of a competitive public procurement process, either through competitive bidding or competitive negotiation, but rather through the "actions and emails of Tyson." Compl. ¶¶ 6, 30. Therefore, it must be "otherwise authorized by law" to be valid.

As established *supra*, the contract cannot be validated through the law of apparent authority. Moreover, the contract does not fall within any of the exemptions to, or variations of, competitive bidding or negotiation found in Va. Code § 2.2-4303. This section allows public bodies to dispense with competitive bidding or negotiation when, for example, there is only one source practicably available for that which is to be procured, in cases of emergency, or the amount of services purchased is not expected to exceed $100,000. Va. Code Ann. § 2.2-4304(E)–(G). The Plaintiff offers a number of cases that purport to "otherwise authorize" this contract by law.

In 2002, this very Court passed upon a similar situation in *Commonwealth Biotechnologies v. Virginia Commonwealth Univ.*, 59 Va. Cir. 98 (City of Richmond, 2002). In *Commonwealth Biotechnologies*, Judge Johnson found that sovereign immunity cannot function to void a valid contract entered into by a duly authorized agent of the government. In language cited multiple times by the Plaintiff, this case stated that "accepting the [VPPA-shield] argument would allow the Commonwealth to refuse to honor its valid contract after having received the benefits of it because it, the Commonwealth, failed to follow applicable law. Such a result would be directly contrary to the spirit and rationale, if not the holding, of *Wiecking* [discussed *infra*]." 59 Va. Cir. at 106–07.

However, the opinion in *Commonwealth Biotechnologies* was delivered at the demurrer stage, when all disputed facts were resolved in favor of the Plaintiff (the party seeking enforcement of the agreement). Therefore, the contract was presumed to be valid for the purposes of ruling on the demurrer. *Commonwealth Biotechnologies* assumes the validity of the contract from the outset, stating "[Commonwealth Biotechnologies] and

VCU thereafter entered into a contract under which CBI agreed to... ." *Id.* at 98. In the present matter before the Court, we cannot presume the validity of the contract. The validity of this contract is at the heart of the present dispute, and we are not evaluating a demurrer. We cannot assume the validity of this contract the same way *Commonwealth Biotechnologies* did. *Commonwealth Biotechnologies*, having assumed the validity of the underlying contract from the outset, may not be as controlling as the Plaintiff would like the Court to believe.

Nor may be *Wiecking v. Allied Medical Supply Corp.*, 239 Va. 548 (1990), on which Plaintiff relies. Plaintiff draws our attention to this language from *Wiecking*:

> [W]hen the state contracts for goods or services, receives the benefit of the contract, and then refuses to honor its obligations, the contractor's property is subjected to an unconstitutional taking without just compensation; a denial of liability under such circumstances also violates state and federal due-process guarantees; to hold that the state may enter into a valid contract and yet retain the power to avoid its obligation would entail an obvious contradiction; neither the state nor the contractor can be bound, yet not bound, by a single contract; the courts will not attribute to the legislature any intention to permit the government to exercise "bad faith and shoddy dealing," and relegating the injured party to an appeal for justice to the legislature in the form of a private bill for relief is to offer a "doubtful remedy."

*Wiecking*, 239 Va. at 551–52 (internal citations omitted). But again, the *Wiecking* Court determined the contract to be valid. Although the Commonwealth disputed the validity of the contract by contesting the ability of the Chief Medical Examiner to enter into it, the Court found that this power to contract was "necessarily incidental to the performance of his duties." *Id.* at 555. The Court found *express* authority for the public official to enter into the contract in question; not apparent authority. Moreover, this case was pre-VPPA, when there were no statutory, binding, overarching public bidding requirements for that contract as there are now.

Tyson's authority to enter into the present contract with Landfall was not "necessarily incidental to the performance of his duties." As it was a contract with nongovernmental contractors for the purchase of services, it needed to be awarded through the public bidding procedures of the Act. *See* Va. Code Ann. § 2.2-4303(A). While the language and rationale of *Wiecking* seem to support the Plaintiff's argument, they ignore the fact that contracts such as the one at bar simply need to be awarded through the competitive procedures of the Act.

And finally, the reliance on *Burroughs v. Board of Visitors of Norfolk State Univ.* is misplaced. The plaintiffs in *Burroughs* brought actions for breach of contract against Norfolk State University after their employment offers were rescinded. 66 Va. Cir. 120 (City of Norfolk, 2004). However, the Commonwealth, in that case, had expressly authorized the contracts at issue. The General Assembly delegated contracting authority to the Board of Visitors of Norfolk State, who in turn delegated the authority to enter into contracts to President Marie McDemmond. *Id.* President McDemmond then delegated this authority to those NSU officers that made and signed the employment contracts. Again, the contracts at issue in *Burroughs* were created pursuant to an *express* delegation of authority and were valid from the outset. There is no evidence that the contract between Tyson and Landfall was similarly authorized.

The situation at hand may more closely approximate what we see in *King George County Serv. Auth. v. Presidential Service Co. Tier II*, 267 Va. 448 (2004). In *King George*, a private entity entered into more than one agreement with the County Service Authority, but only one of these agreements was approved by a majority of the Authority's board members. *King George*, 267 Va. at 450–54. The statute creating the Service Authority stated clearly that the powers of the Service Authority are exercised by the board, Va. Code § 15.2-5113(A), and a vote of the majority of the board's members was necessary for *any* action taken by the Service Authority, Va. Code § 15.2-5113(B). *Id.* at 455. Moreover, the Service Authority served a very limited statutory purpose: "to acquire existing, privately owned water and sewer systems in King George County." *King George*, 267 Va. at 448. Although the record was "replete with evidence regarding the negotiations between" the managing member of the private entity and the general manager of the Service Authority, *id.*, the Supreme Court of Virginia upheld only that agreement which was specifically ratified by the Service Authority's board, the only agreement authorized by the governing statutory procedures. *Id.* at 456.

In the case at bar, VSU is a "body corporate … under the management, supervision and control of the board," Va. Code § 23-166, and the board "shall control and expend the funds of the University and any appropriation hereafter provided." Va. Code § 23-165.6. Moreover, the board shall "provide for the disbursing of the funds of the University consistent with the laws of the Commonwealth." Va. Code Ann. § 23-167. Those "laws of the Commonwealth" include the VPPA, which governs the manner in which "[*a*]*ll* public contracts" are awarded. Va. Code Ann. § 2.2-4303(A) (emphasis added).

It is undisputed that the board of VSU had nothing to do with the agreement between Tyson and Landfall. Further, given that nobody from VSU signed the contract between the parties, the board itself cannot be said to have ratified the agreement. Much like the general manager of

the Service Authority in *King George*, Tyson could not bind VSU in the absence of board approval. Not only was there no board *action* in creating the agreement in the case at bar, but there was no *approval* from the board either. Tyson's lack of authority to bind VSU is held up to the light next to the absence of any public competitive bidding or competitive negotiation under the Act. Like *King George*, the record here is replete with evidence regarding the negotiations between Tyson and Lundvall. But no amount of negotiations between those two individuals can overcome the fact that this contract was awarded without regard to the Act and without the knowledge of, let alone the approval of, VSU's board.

The VSU Defendants point to a wealth of Virginia authority holding that "anyone dealing with an officer or employee of a public body must ascertain the extent and nature of that person's authority." *King George*, 267 Va. at 465 (citing *Richard L. Deal & Assocs. v. Commonwealth*, 224 Va. 618, 623 (1983)); *see also American-LaFrance & Foamite Indus. v. Arlington Cnty.*, 164 Va. 1 (1935). When an agent of the Commonwealth attempts to bind the state without authority to do so, the purported agreement is *ultra vires*. *Deal*, 224 Va. at 622. "An *ultra vires* contract is void *ab initio* — not voidable only, but wholly void, and of no legal effect, and no performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it." *Id.* at 623 (internal quotations and citations omitted). Given the lack of VPPA compliance and the absence of board approval, Tyson did not have the authority to bind VSU to this contract. Accordingly, the contract between Tyson and Landfall is void *ab initio* and *ultra vires*.

The Court notes, in conclusion and in light of the above discussion, that the purpose of the Act was to avoid the award of personal services contracts in the manner we see here. *See* Va. Code Ann. § 2.2-4300 ("[I] t is the intent of the General Assembly that competition be sought to the maximum feasible degree."). The procedure by which Tyson and Landfall reached the present agreement was the opposite of open and competitive. Plaintiff has not directed us to any tenable manner in which this agreement can be "otherwise authorized by law," Va. Code § 2.2-4303, sufficient to overcome the deficiencies described above. Although Plaintiff vehemently argues that a public agency cannot use the Act as a shield, the statutory and case law of Virginia often suggest otherwise.

As aptly stated by the trial judge in *Deal*, and reiterated by the Supreme Court of Virginia upon affirming his findings, such a result would be "offensive and unfair." 224 Va. at 623. Lundvall ostensibly "dealt in good faith with a public servant who exceeded the bounds of his authority." *County of York v. King's Villa, Inc.*, 226 Va. 447, 450 (1983). Yet, "those who deal with public officials must at their peril take cognizance of their power and its limits." *Bristol*, 153 Va. at 83. The weight of authority in the Commonwealth of Virginia favors the VSU Defendant's position that

this contract is *ultra vires* and void *ab initio*, and, as a matter of law, no recovery can be had therein. Summary judgment could be granted to the VSU Defendants and denied to Landfall. But for the reasons that follow, it will not be.

## A Decision for Landfall

This Court, or a court further up the judicial food chain, could easily take a hard look at the facts, equities, and quest for justice and find in favor of Landfall. This Court will take this route. The rest of this opinion is the opinion of the Court.

## Breach of Contract

### A. *Apparent Authority*

Plaintiff's first argument for finding the existence of a contract, and thus a corresponding breach committed by the VSU Defendants, is the doctrine of apparent authority.

When an agent, acting within the scope of its apparent authority, enters into a contract with a third person, "the principal becomes immediately a contracting party, with both rights and liabilities to the third person." *Equitable Variable Life Ins. Co. v. Wood*, 234 Va. 535, 539 (1987) (quoting *Restatement (Second) of Agency*, § 292 (1957)). Apparent authority will be found if "in view of the character of the agent's actual and known duties, an ordinarily prudent person, having a reasonable knowledge of the usages of the business in which the agent is engaged, would be justified in believing that the agent is authorized to perform the act in question." *Wright v. Shortridge*, 194 Va. 346, 353 (1952). Apparent authority is determined by how the principal "holds out" its agent to a third party, which can occur by virtue of the agent's position alone. *See, e.g., Avery-Craft v. Young Hee Moon Kang*, 77 Va. Cir. 53, 54 (Prince William County, 2008); *Johnson v. Shaffer*, 33 Va. Cir. 57, 72 (Warren County, 1994).

Plaintiff avers, and the Court ultimately agrees, that Tyson had the apparent authority to enter into the contract in question here. An ordinarily prudent person in Lundvall's position would unquestionably have believed that Tyson had the authority to enter into this contract. Tyson was the Vice President of Institutional Advancement at VSU. By title alone, an ordinarily prudent person would believe that Tyson could bind VSU to a contract for marketing services. His position of authority within the structure of VSU, coupled with the natural connection between marketing and institutional advancement, would create this reasonable impression.

Moreover, an agency relationship and associated apparent authority can be inferred from the course of dealing between the parties and the surrounding facts and circumstances. *See Acordia of Virginia Ins. Agency*

*v. Genito Glenn, L.P.*, 263 Va. 377, 384 (2002). The course of dealing between Tyson, Lundvall, and the Institutional Advancement Team create the clear impression of valid authority in the case at bar. *See, e.g.*, Pl.'s Mem. Supp. Mot. Summ. J. Ex. 3 (an email in which Louis Dabney, chair of the Institutional Advancement subcommittee at VSU, wrote "Good Morning Rich [Lundvall], Welcome Aboard!"). Based on the foregoing and the undisputed evidence before Court, we must find that Tyson had the apparent authority to bind VSU and, therefore, the contract with Landfall is a valid one.

## B. *The Virginia Public Procurement Act*

The parties further disagree on the extent to which the Virginia Public Procurement Act (the "Act" or "VPPA"), Va. Code Ann. § 2.2-4300 *et seq.*, controls the outcome of this matter. The VSU Defendants aver that the purported contract in the instant case is nothing more than an invalid public contract, awarded in violation of the Act and, therefore, void. They argue that to be valid, a "public contract must be awarded in strict accordance with the Act's statutory scheme, which prescribes the mandatory methods that public bodies must use to procure goods and services." Def.'s Mem. Supp. Mot. Summ. J. 9. Plaintiff contends that the VSU Defendants may not hide behind the Act and use it as a shield against liability. Plaintiff argues that VSU's own failure to conduct competitive sealed bidding or competitive negotiation in conformance with the statutory requirements should not be grounds for sliding out from under their obligation to pay for services rendered.

A review of the Act is necessary at the outset. The purpose of the Act is to "enunciate the public policies pertaining to governmental procurement from nongovernmental sources." Va. Code Ann. § 2.2-4300. It states that "[a]ll public contracts with nongovernmental contractors for … the purchase of services … shall be awarded after competitive sealed bidding, or competitive negotiation as provided in this section, *unless otherwise authorized by law*." Va. Code Ann. § 2.2-4303(A) (emphasis added).

"Public contract," in the context of the Act, means "an agreement between a public body and a nongovernmental source that is enforceable in a court of law." Va. Code Ann. § 2.2-4301. "Services" means "any work performed by an independent contractor wherein the service rendered does not consist primarily of acquisition of equipment or materials, or the rental of equipment, materials, and supplies." *Id.*

The VSU Defendants argue at length that this language from the Act renders the present contract *ultra vires* and void *ab initio*, contending, essentially, that failure to conduct competitive bidding or negotiation automatically renders a public contract invalid. "[T]he only authority to enter into public contracts granted to public bodies is limited to awarding the contract as a result of competitive procurement conducted according

to the VPPA's mandatory procedures." Def.'s Mem. Supp. Mot. Summ. J. 11. However, this construction ignores the "unless otherwise authorized by law" language of Va. Code § 2.2-4303(A). As described above, VSU is liable on the instant contract through the apparent authority of Tyson; his apparent authority and the reasonable reliance of Lundvall otherwise authorizes this contract by law.

But further, in a survey of national authorities in *Wiecking v. Allied Medical Supply Corp.*, the Supreme Court of Virginia stated that:

> [W]hen the state contracts for goods or services, receives the benefit of the contract, and then refuses to honor its obligations, the contractor's property is subjected to an unconstitutional taking without just compensation ... a denial of liability under such circumstances also violates state and federal due-process guarantees ... [and] to hold that the state may enter into a valid contract and yet retain the power to avoid its obligation would entail an obvious contradiction; neither the state nor the contractor can be bound, yet not bound, by a single contract. [Further,] the courts will not attribute to the legislature any intention to permit the government to exercise "bad faith and shoddy dealing," and relegating the injured party to an appeal for justice to the legislature in the form of a private bill for relief is to offer a "doubtful remedy."

239 Va. 548, 552–53 (1990) (internal citations omitted). In opposition, the VSU Defendants argue that they enjoy sovereign immunity from the present suit. Def.'s Mem. Supp. Mot. Summ. J. 9. However, *Wiecking* dispensed with this argument when it held that "the doctrine of sovereign immunity has no application in actions based upon *valid* contracts entered into by duly authorized agents of the government." *Id.* at 553 (emphasis added) (stating further that "[t]he sovereign is as liable for its contractual debts as any citizen would be").

Moreover, a similar situation to the case at bar passed through this very court in 2002. In *Commonwealth Biotechnologies v. Virginia Commonwealth Univ.*, Judge Johnson rejected a state university's attempt to avoid performance of a contract they had validly entered into with a private entity. 58 Va. Cir. 98, 107–08 (City of Richmond, 2002). In *Commonwealth Biotechnologies*, Virginia Commonwealth University argued — similarly to VSU in the case at bar — that a public body's failure to comply with the Act was grounds to avoid performance of the contract. *Id.* at 106. Judge Johnson held unequivocally that using the VPPA as a shield would "allow the Commonwealth to refuse to honor its valid contract after having received the benefits of it because it, the Commonwealth, failed to follow applicable law. Such a result would be directly contrary to the spirit and rationale, if not the holding, of *Wiecking*." *Id.* at 107–08.

The language of the Act itself allows Plaintiff to recover some, but not all, of the contract value. It states:

> Where the award has been made and performance has begun, the public body may declare the contract void upon a finding that this action is in the best interest of the public. Where a contract is declared void, the performing contractor shall be compensated for the cost of performance up to the time of such declaration. In no event shall the performing contractor be entitled to lost profits.

Va. Code Ann. § 2.2-4360. Although this code section is written in the context of bid protests, the Court believes it is applicable to the case at bar. It is the only section of the Act the Court could find that permits a public agency, by their own decision, to unilaterally declare a contract void. Further, given that the Court has determined the instant contract to be valid, the Court believes this code section fixes the amount of recovery available to Plaintiff: "the cost of performance up to the time of such declaration."

Vice President of Administration and Finance for VSU, David Meadows, wrote in an email to Lundvall on October 22, 2012, that "[t]he contract submitted to your firm [Landfall] was initiated by an individual without authority to do so; therefore, your contract is void." Pl.'s Mem. Supp. Mot. Summ. J. Ex. 21. As of that date, Lundvall had submitted three invoices and done a good deal of work on the contract. When the Plaintiff was not paid on their initial invoices, Plaintiff re-submitted the invoices to VSU with late fee service charges included. The total value of these three invoices *with* late fees included is $77,355.00. See Def.'s Mem. Supp. Mot. Summ. J. Ex. 5. Plaintiff's prayer for relief is for the value of the three invoices *without* late fees: $76,500.00. Pl.'s Mem. Supp. Mot. Summ. J. 17. The Court believes the latter is the proper measure of the cost of performance in this instance. The Court believes that Plaintiff is entitled to be "compensated for the cost of performance up to the time of" Meadows' declaration: $76,500.00.

### *A Note on Account Stated*

It is challenging to pin down a direct explanation of the element of an "account stated" claim in Virginia jurisprudence. However, the parties both cited to one case that offers the best obtainable standard:

> An account stated is where the accounts between the parties have been either actually settled, or are presumed to be so from the circumstance of a party's retaining, for a long time, without objection, the account of the other party, which has been presented to him, showing a balance against him. By the settlement (or implied admission which is considered equivalent) it has become an ascertained debt. All intricacy

of account, or doubt as to which side the balance may fall, is at an end; and thus the case is neither within the letter nor the spirit of the exception.

*Ellison v. Weintraub*, 139 Va. 29, 34-35 (1924) (quoting *Watson v. Lyle's Adm'r*, 4 Leigh (31 Va.) 236, 249 (1833)).

Plaintiff also cites to *James River Bldg. Supp. Co. v. Diversified Dev., Inc.*, 2 Va. Cir. 28 (Henrico County, 1980). This case states that actions for Account Stated are based on "the express reaching of a balance, and agreement thereon between the parties ... or on retention of a statement by the other party, without objection made, for more than a reasonable time for its investigation." *Id.* at 31.

Defendant points out that:

> [T]he mere rendering of an account by one party to another, is not sufficient to make it an account stated. For that purpose there must either be an actual statement and adjustment of the account by the parties by going over the items together and striking the balance, or an admission by one party of the correctness of the balance struck by the other, or some other evidence to show that the party who is sought to be charged has, by his language or conduct, admitted the correctness of the account.

*Robertson v. Wright*, 58 Va. (17 Gratt.) 534, 541 (1867).

Moreover:

> Lacking an expressly settled account, an account stated also exists where a set of circumstances exist that collectively create a presumption that, over time, an unsettled account has become an ascertained debt. An account is presumed to be settled via an implied admission where a party retains, "for a long time, without objection, the account of the other party, which has been presented to him, showing a balance against him."

*Quadriga Art, Inc. v. Law Enforcement Alliance of Am.*, 70 Va. Cir. 99, 101 (Fairfax County, 2005) (*quoting Ellison v. Weintrob*, 139 Va. 29, 35 (1924)).

Based on this standard, the Account Stated claim must fail as a matter of law. *Ellison* informs us that the account must be "retain[ed], for a long time, *without objection*," and "[a]ll intricacy of account, or doubt as to which side the balance may fall, is at an end." 139 Va. at 34-35. The first invoice in this matter was submitted on June 23, 2012, but was officially objected to, at the very latest, by Meadow's email of October 22, 2012. Pl.'s Mem. Supp. Mot. Summ. J. Ex. 20. This difference of less than four months is not a "long time." *See Ellison*, 139 Va. 29 (finding that three years was a

sufficiently long time). Moreover, "the doubt as to which side the balance may fall" is hardly at an end; it is the subject matter of the present action. Further, there has been no "adjustment of the account by the parties by going over the items together and striking a balance." *Robertson*, 58 Va. at 541. Based on this standard, the amount claimed by Plaintiff reflects neither the certainty, nor the length of time, required to recover under Account Stated. Accordingly, the summary judgment motions of both parties as to this claim are denied, and this claim is dismissed with prejudice.

### The Decision of the Court

The decision here delivered is sure to please neither side. It would be of no surprise to see both sides seeking relief up the judicial food chain. The VSU Defendant's position is no doubt the general rule. All general rules have exceptions, but it is important that the exceptions not "swallow up" the rule, as it is so often opined. The partial decision here in favor of Landfall does not do great disservice to the general rule. What is a marketing vendor to do in a case like this? Ask to see some sort of "purchasing badge of authority and identification" similar to those displayed by the police and other enforcement authorities? Is the marketing vendor to ask to see some sort of printed commission of purchasing authority with a state seal? Perhaps the marketing vendor should surreptitiously call the chairman of the board, the university president, or the head of the purchasing department and question the acts of the Marketing VP with whom he is dealing and negotiating? Where would that lead? It was entirely reasonable in the limited facts of this case for Lundvall to think he had a valid contract entered by a person with apparent authority.

If Lundvall had entered the same course of dealing with the janitor, a secretary, an assistant football coach, Tyson's secretary, or even one of Tyson's assistants, then woe be to Lundvall's position that he thought there was apparent authority. In this case, Lundvall was justified in thinking Tyson had apparent authority to contract for marketing services.

The Act sets forth a procedure to protect the taxpayer against sweetheart no-bid contracts. Where such a contract is discovered by a competitor, the Act provides a mechanism for the competitor to protest and potentially void the contract. *See* Va. Code Ann. § 2.2-4360. The Act further provides that the beneficiary of the no-bid contract should be compensated for the work provided up to the point the contract is voided. The VSU Defendants take the position that, where the Commonwealth voids the contract without being moved to do so by a competitor, the no-bid contracting party gets nothing. This is incongruous. This is clearly not the spirit of the Act as envisioned by the General Assembly. This is unjust. This is a result this Court will not let stand.

The Court must candidly acknowledge that it may be somewhat influenced by an earlier decision by a well-known and respected past

member of this Court, Judge Randall Johnson. *See Commonwealth. Biotechnologies v. Virginia Commonwealth Univ.*, 58 Va. Cir. 98 (City of Richmond, 2002). However, the present decision would be the same even without Judge Johnson's prior decision. All general rules, including the Act, were put in place to promote justice and advance clear policies. Where general rules result in clear injustices, most jurists will find an exception. This is the case with this Court's current decision.

The VSU Defendants have written and orally argued the Latin phrase "*in pari delicto*" in this case more than one would normally encounter in a legal career. For the most part, it has not been overly helpful. It does, however, have a bearing upon the issue of attorney's fees. Some of the fault for this litigation must be laid at the feet of Lundvall. For this reason he will bear his legal expenses.

A reviewing court may well reach the conclusion that this Court has incorrectly "split the baby" in its logic and decision. That was not this Court's intention. The structure of this opinion is meant to provide the option of a reviewing court to adopt this Court's final decision as a proper analysis yet limit its application to the detailed facts of this case without doing serious damage to existing law. In the alternative, a reviewing court could simply adopt either the Plaintiff's or Defendant's positions as described above. Of course, this decision may be entirely off the mark and an entirely new approach may be in order. Obviously this comment should provide the reader some sense of the difficulties with which this trial court has wrestled to reach this conclusion

In summary, the Court awards $76,500.00 to Plaintiff, with post-judgment interest thereon at the rate of 6% *per annum* until paid, and no attorney's fees. Summary judgment is granted to Plaintiff on the breach of contract claim, and all other summary judgment motions of the parties are denied, and the cause is hereby ended.